UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------------X

LUCY YORK,

                                       Plaintiff,

               -against-

THE CITY OF NEW YORK; NYPD OFFICER JORGE GARCIA;
NYPD OFFICER LEONEL O. GIRON (SHIELD NO. 21368, TAX
ID. NO. 959658); NYPD OFFICER JUSTIN M. SCHIVEK (SHIELD
NO. 13458, TAX ID. NO. 957141); NYPD SERGEANT THOMAS
W. QUEVEDO (PREVIOUSLY SHIELD NO. 5154, NOW SHIELD
NO. 2770, TAX ID. NO. 951094); NYPD ASSISTANT CHIEF
JOSEPH GULOTTA, TAX ID 904089,and NYPD MEMBER JOHN
DOE 1B,

                                   Defendants.

-----------------------------------------------------------------------------------X

**FIRST AMENDED
COMPLAINT**

**Case No. 22-cv-6432**

       Plaintiff LUCY YORK, by her attorneys, COHEN & GREEN P.L.L.C. and Gideon Orion

Oliver, hereby complains of Defendants as follows:

## JURISDICTION AND VENUE

1. Plaintiff brings this action pursuant to 42 U.S.C. § 1983, the First, Fourth, and Fourteenth

    Amendments to the United States Constitution, and New York State and City law.

2. This Court has jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1331, 1343, and

    1367, and 42 U.S.C. § 1983.

3. Venue is proper pursuant to 28 U.S.C. § 1391, et seq., in the Eastern District of New York,

    where Plaintiff resides, Defendant City of New York has offices, and the majority of the actions

    complained of herein occurred.

4. Plaintiff timely served Notices of Claim on the municipal Defendant and complied with all

    conditions precedent to commencing an action under state law.

5. At least thirty days have elapsed since service of Plaintiff's Notice of Claim and adjustment and payment thereof has been neglected or refused.

6. This action has been initiated within one year and ninety days of the accrual of Plaintiff's claims pursuant to New York State Law.

## PARTIES

7. At all times mentioned herein, Plaintiff, LUCY YORK (Ms. York; she/her) was a resident of Kings County in the City and State of New York.

8. At all relevant times mentioned herein, Defendant, City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

9. At all relevant times, NYPD Officer Jorge Garcia was assigned Shield No. 284, Tax Id. No. 938528, and Command 172. Defendant Garcia participated in arresting and assaulting Plaintiff as detailed below. Defendant Garcia's name appears on Plaintiff's Desk Appearance Ticket, and upon information and belief, Defendant Garcia issued that ticket.

10. At all relevant times, NYPD Officer Leonel O. Giron was assigned Shield No. 21368, Tax Id. No. 959658. Defendant Giron participated in arresting and assaulting Plaintiff as detailed below.

11. At all relevant times, NYPD Officer Justin M. Schivek was assigned Shield No. 13458, Tax Id. No. 957141. Defendant Schivek participated in arresting and assaulting Plaintiff as detailed below.

12. NYPD Sergeant Thomas W. Quevedo was previously Shield No. 5154, and is now assigned Shield No. 2770; at all relevant times, he has been assigned Tax Id. No. 951094. Defendant Quevedo participated in arresting and assaulting Plaintiff as detailed below.

13. At all relevant times, NYPD Assistant Chief Joseph Gulotta was assigned Tax ID 904089. Defendant Gulotta participated in arresting and assaulting Plaintiff as detailed below.

14. Plaintiff does not currently know the names of one of the Doe Defendant, John Doe 1b, but his name is, upon information and belief, known to the Defendants.

15. Additionally, John Doe 1b is identifiable as the person holding down Plaintiff in Defendant Garcia body-worn camera video, wearing a ring (circles and text added):

 

16. Each individual Defendant is sued in his or her individual and official capacities.

17. The Defendants are NYPD members who unlawfully used excessive force, arrested, and/or detained Plaintiff and others similarly situated in violation of their constitutional rights.

18. At all times hereinafter mentioned, the Defendants were employed by the City of New York as members of the NYPD.  One of their true names, as noted throughout this Complaint, are currently unknown to the Plaintiff.

19. At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

20. Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

21. Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

22. Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

23. At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

24. Although there was a reasonable opportunity to do so, at no time did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

## STATEMENT OF FACTS[1]

---

[1] Many of the allegations below are provided not as policies that specifically harmed Plaintiff, but as context for the harm she suffered. That is, the totally lawless atmosphere fostered by Defendants during the summer of 2020 and beyond lead to Defendants' apparent total disregard for Plaintiff's — and others' — rights.

**THE SUMMER 2020[2] PROTESTS IN SUPPORT OF BLACK LIVES**

25. On May 25, 2020, police killed George Floyd. Almost immediately, protests against police violence and in support of police accountability and the Black Lives Matter movement spread across the United States and the world, including here in New York City where thousands exercised their constitutional rights to protest.

26. In the days and weeks following Floyd's killing, the New York City Police Department ("NYPD") engaged in activities that violated the constitutional rights of individuals who were protesting police misconduct, including, *inter alia,* corralling protestors into spaces where they could not escape, beating protestors with batons and fists, throwing protestors to the ground, using pepper spray indiscriminately, and ultimately arresting many of the protestors without lawful justification and without fair warning. Protestors were physically restrained with tight handcuffs - often, but not exclusively, with plastic flex-cuffs - for excessively long period of time in such a manner that caused them unnecessary pain and suffering and, in some cases, possible serious and long-term nerve damage. They were also subjected to lengthy and unnecessary arrest processing that put them in dangerously close quarters, all at the height of the global COVID-19 pandemic.

---

Consider, for example, the routine use of the kettling tactic before the curfew and then holding of protesters until the curfew was in effect, to generate supposed probable cause — and then malicious use of that supposed probable cause to brutalize protesters — likely made the officers who arrested Plaintiff feel emboldened to make a purely retaliatory arrest for Plaintiff's choice to protest, and to take sexual liberties in the process. So too with the total refusal to provide protesters a meaningful opportunity to disperse wrongly taught officers and supervisors that arrests did not require any meaningful opportunity to disperse after an order.

[2] The protests that started during the summer of 2020 continued well past the end of 2020. Courts and parties alike have acknowledged this, but still referred — perhaps for convenience — to the protest movement that started in the summer of 2020 as the summer 2020 protests. *See, e.g., In re NY City Policing During Summer 2020 Demonstrations*, 548 F Supp 3d 383, 394 (SDNY 2021) (describing, as part of the protests that erupted in the wake of George Floyd's death, a protest on "January 18, 2021, Martin Luther King Day"). This complaint adopts that convention — and therefore, references to the "2020 protests" and similar phrases should be understood to refer to the broader protest movement that continued well into 2021 — and the response from the NYPD and the City to that movement that similarly continued apace.

27. The unlawful policies and practices used by Defendants against protestors included a crowd-control tactic known as "kettling" to corral and detain individuals who were engaged in peaceful protest. Defendants used kettling and similar tactics in order to impede constitutionally protected First Amendment activities, to conduct mass arrests without probable cause, and to deter those arrested and beaten, and others, from exercising their First Amendment rights in the future.

28. In addition, NYPD officers also targeted and arrested legal observers, medics, and other workers performing essential services without probable cause.

29. By contrast, these same Defendants have responded to other protests (including, in particular, "Blue Lives Matter" and other pro-police protests) without using the same tactics employed against those who protested police conduct during the racial justice protests of 2020.

30. The police actions in this case were part of overlapping policies and practices of the City of New York and the NYPD which were well known to New York City Mayor Bill de Blasio, New York City Police Commissioner Dermot Shea, and other City policymakers. These overlapping policies and practices include, *inter alia,* the use of excessive force, false arrests, and excessive and unreasonable detention at certain demonstrations—particularly those that focus on misconduct by the NYPD—but not others. These overlapping policies and practices have existed for years and have often resulted in litigation.

**THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS**

31. The violations suffered here by Plaintiff are at the common intersection of the NYPD's long history of permitting sexual misconduct by its members and its long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, *inter alia*, protests denouncing the murder of Amadou Diallo in 1999, as well

as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

## THE COVID-19 PANDEMIC IN NEW YORK CITY

32. As protesters were taking to the streets in the summer of 2020 to speak out against police brutality and in support of Black lives, the COVID-19 virus raged across the country.

33. In April 2020, Governor Cuomo ordered people to wear protective face masks in public, to protect themselves and others from the spread of the virus.

34. However, many police officers failed to abide by this directive to wear masks. And many officers who interacted with and arrested protesters in May and June of 2020 were not wearing face masks, even as the City continued to record hundreds of new coronavirus cases each week. By contrast, most protesters wore protective face masks—at least until their contacts with NYPD members.

35. During their arrests, some protesters masks fell off or were removed. These protesters were transported in vans and/or buses and placed in holding cells in close indoor contact with other arrestees whose masks fell off or were removed, and police officers who were not wearing masks.

## STATE AND CITY OFFICIAL REPORTS ON THE SUMMER 2020 PROTESTS RELIED ON BY PLAINTIFF, IN PART, IN SUPPORT OF PLAINTIFF'S MUNICIPAL LIABILITY CLAIMS

36. In support of Plaintiff's municipal liability claims, in part, Plaintiff relies on the contents of certain reports referred to in this pleading, including the New York State and New York City

agency reports below. including, *inter alia,* the report issued by the New York City Corporation Counsel and the report issued by the New York City Department of Investigation.[3]

37.     In July 2020, the New York State Office of the Attorney General (the "AG") issued a preliminary report on the NYPD's response to the May and June protests ("AG Report").[4]

38.     The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observers, elected officials, and essential workers.

39.     The AG Report also found the pervasive failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

40.     In December of 2020, the NYC Department of Investigation issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").

41.     The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[5]

---

[3] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.
[4] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, ("AG Report"), July 2020, available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.
[5] DOI Report at 36.

42.     In addition to noting the heavy-handed response by the SRG at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[6]

43.     The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to peaceful First Amendment expression.

44.     The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

45.     The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

46.     According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[7]

47.     The DOI also found that Black arrestees were disproportionately charged with felonies.[8]

48.     The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[9]

49.     According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[10]

**SEXUAL MISCONDUCT AND ABUSE BY MEMBERS OF THE NYPD**

---

[6] *Id.* at 61.
[7] *Id.* at 26.
[8] *Id.* at 27.
[9] DOI Report at 56.
[10] *Id.* at 28.

50. Members of the NYPD have repeatedly engaged in sexually-based misconduct, violence, and harassment of civilians,[11] including during responses to protests such as Occupy Wall Street and Black Lives Matter demonstrations.

51. For example, in *Perloff v City of New York et. al,* 1:13-cv-04175 (KBF)(S.D.N.Y), Plaintiff Perloff alleged that Defendant NYPD Sergeant Catapano grabbed her breast forcefully and intentionally while arresting her after she initially asked him not to touch her chest. Perloff's suit stated that this conduct was consistent with widespread sexual misconduct by police at the Occupy Wall Street demonstration at which her assault occurred.

52. According to Perloff's attorney, "In his deposition, [Defendant NYPD Sergeant] Catapano stated that he had not received training on sex crimes since 2000 and that he believed 'you grab whatever means necessary to effect an arrest.'"[12]

53. Additional lawsuits and accounts in the media similarly recognized and alleged the widespread use of sexual misconduct and/or battery, particularly groping the breasts of protestors, as a tactic by the NYPD at these demonstrations.[13]

---

[11] *See* Joshua Kaplan & Joaquin Sapien, *NYPD Cops Cash in on Sex Trade Arrests with Little Evidence, While Black and Brown New Yorkers Pay the Price*, PROPUBLICA, Dec. 7, 2020, *available at*: https://www.propublica.org/article/nypd-cops-cash-in-on-sex-trade-arrests-with-little-evidence-while-black-and-brown-new-yorkers-pay-the-price; *see also* Joaquin Sapein, Topher Sanders & Nate Schweber, *Over a Dozen Black and Latino Men Accused a Cop of Humiliating, Invasive Strip Searches. The NYPD Kept Promoting Him.* PROPUBLICA, Sept. 10, 2020, *available at:* propublica.org/article/over-a-dozen-black-and-latino-men-accused-a-cop-of-humiliating-invasive-strip-searches-the-nypd-kept-promoting-him; Natasha Lennard, *In Secretive Hearing, NYPD Cops Who Raped Brooklyn Teen in Custody Get No Jail Time*, THE INTERCEPT, August 30, 2019, available at: https://theintercept.com/2019/08/30/nypd-anna-chambers-rape-probation/.

[12] *See* Christopher Robbins, *OWS Protestor Who Had Her Breast Grabbed by NYPD Sergeant Gets $95,000 Settlement*, GOTHAMIST, Sep. 8, 2015, *available at:* https://gothamist.com/news/ows-protester-who-had-her-breast-grabbed-by-nypd-sergeant-gets-95k-settlement.

[13] *See, e.g., Rechtschaffer v. The City of New York*, 13 Civ. 0709 (JPO) (S.D.N.Y.); Kathryn Funkhouser, *The Silencing of Cecily McMillan*, THE TOAST, April 14, 2014, *available at*: https://the-toast.net/2014/04/14/silencing-cecily-mcmillan/2/.

54. In 2018, The New York City Council introduced a host of bills that mandated sexual sensitivity and assault investigation training for members of the NYPD in the wake of information about the Department's treatment of sexual assault victims.[14]

55. However, at a Council hearing in 2021, it was clear that these issues persisted.[15]

56. The Defendants have been on notice about sexual misconduct by NYPD members and the need for training and discipline around these harms for years, but have failed to address these issues in any meaningful way.

57. In fact, as in the case of Assistant Chief of NYPD Christopher McCormack, members who are accused of sexual misconduct often rise through the ranks.[16]

58. McCormack has been accused by more than a dozen people of humiliating and abusive sexual conduct, including public strip searches and forcibly inserting his fingers into their anal cavities during legally prohibited "searches."[17]

59. In 2018, the Civilian Complaint Review Board (CCRB) announced that the scope of the problem of sexual misconduct including assault by members of the NYPD necessitated an expansion of CCRB rules to allow the independent oversight agency to investigate such complaints, and the CCRB Board adopted this change by unanimous vote in February 2018.[18]

---

[14] *See* New York City Council (October 18, 2021) *Joint Hearing with Women and Equity and Public Safety*, minutes and video available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=896997&GUID=54E40D2E-C083-4B1B-AB17-1328C10A783E&Search=; *see* John del Signore, *NYPD Cop Accused of Groping His "Favorite Rape Victim,"* GOTHAMIST, January 16, 2015, *available at*: https://gothamist.com/news/nypd-cop-accused-of-groping-his-favorite-rape-victim.

[15] *Id*.

[16] *See* Joaquin Sapein, Topher Sanders & Nate Schweber, *Over a Dozen Black and Latino Men Accused a Cop of Humiliating, Invasive Strip Searches. The NYPD Kept Promoting Him*. PROPUBLICA, Sept. 10, 2020, *available at:* propublica.org/article/over-a-dozen-black-and-latino-men-accused-a-cop-of-humiliating-invasive-strip-searches-the-nypd-kept-promoting-him

[17] *Id*.b

[18] New York City Civilian Complaint Review Board, *NYC Civilian Complaint Review Board Votes Unanimously to Investigate Allegations of NYPD Sexual Misconduct*, via Press Release (February 15, 2018) available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/news/pressreleases/2018/20181502_boardmtg_sexualmisconduct_release.pdf

60. For decades the CCRB had referred all sexual misconduct cases to the NYPD's Internal Affairs Bureau (IAB), requiring victims of NYPD-related sexual abuse to interface entirely with the NYPD itself, and no information about any investigations, discipline, or outcomes were made public.

61. The NYPD's Patrolmen's (also Police) Benevolent Association moved to block this CCRB expansion.[19]

62. Ultimately, after reintroducing the proposed rules in a manner consistent with the First Department's holding in *Lynch v Civilian Complaint Review Board*,[20] the agency officially undertook these investigations December 2020.

63. Plaintiff incorporates by reference the information contained in the Civilian Complaint Review Board's data regarding the agency's investigations.[21]

64. According to information provided at the CCRB's public Board Meeting on December 8, 2021, between the time investigations were initiated and the presentation at the December 8th meeting, the CCRB had received 233 complaints within its jurisdiction that included 335 allegations of sexual misconduct by members of the NYPD, and had referred 384 sexual misconduct cases to the IAB and District Attorneys for potential employment and criminal actions.[22] Of these referred cases, 266 were considered "Phase II," meaning they involved serious misconduct such as sexual assault and groping a person over their clothing.[23]

---

[19] *Matter of Lynch v New York City Civilian Complaint Review Bd.*, 2020 NY Slip Op 03062 (1st Dept 2020).
[20] *Id*.
[21]  New York City Civilian Complaint Review Board (December 8, 2021) *December 8, 2021 Public Board Meeting*, minutes available at:
https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/2021/Minutes/12082021_boardmtg_minutes.pdf
[22] December 8, 2021 CCRB Meeting Minutes at 25.
[23] New York City Civilian Complaint Review Board, *Memorandum Accompanying Public Vote* (February 14, 2018) available at:
https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/20181402_boardmtg_sexualmisconduct_memo.pdf

**DISCRIMINATION AGAINST AND SEXUAL HARASSMENT OF TRANSGENDER PEOPLE BY MEMBERS OF THE NYPD**

65. As detailed below, Defendant Giron (a man) reached into Plaintiff's (a woman) pants and touched her genitals, despite her clear statements that she was a woman and should not be searched in that way by a man.

66. As noted in a February 9, 2018 letter responding ("2018 Response to OIG") to an Office of the Inspector General (OIG) Report ("OIG Report"), NYPD policy requires that when requested, "a supervisor *shall* assign an officer of the gender requested by [an] arrestee" to perform any and all searches when there are not safety concerns.  2018 Response to OIG at 11 (emphasis added).

67. Whenever officers depart from such a request, "the factors behind this decision [are supposed to be] recorded in the Command Log." 2018 Response to OIG at 11-12.

68. The OIG Report alleged serious deficiencies in NYPD's treatment of transgender people, including treatment that frequently involved sexual harassment, and a total deficiency in ability to track that conduct.

69. The NYPD vigorously disputed the OIG Report in the 2018 Response to OIG, and claimed to have "implemented" most of its recommendations prior to the OIG Report.  *See* 2018 Response to OIG at 25-28.

70. NYPD objected to OIG's assertions that the NYPD's efforts to train officers on (among other things) the patrol guide provisions regarding searches of transgender arrestees fell short.

71. This complaint pleads two alternatives, that are not necessarily exclusive.

*Alternative 1:  Officer Giron and the Other Defendants Maliciously Ignore Training.*

72. Officer Giron and the other Defendants received and reviewed the "Training Memo" referenced in 2018 Response to OIG at 12-17, whether as part of his in-service training or as part of his academy training.

73. Officer Giron and the other Defendants were trained and repeatedly reminded throughout in service training that "members of service … must treat all individuals in accordance with their preferred gender identity," in a manner that "le[ft] no doubt that the policies apply to gender non-conforming people."

74. No member of the NYPD, including Officer Giron, made any notation in any document recording "the factors behind th[e] decision" to insist on a man (e.g., Officer Giron) conducting the search of Plaintiff, despite having clear notice it was required, as detailed in the 2018 Response to OIG.

75. No member of the NYPD, despite many protests from Plaintiff and nearly a full minute to do so, intervened to stop Officer Giron's violation of NYPD's well-established policies, on which all Defendants were well-trained.

76. The only explanation for this treatment is, essentially, bigotry:  Defendants know that NYPD's policies require them to "treat all individuals in accordance with their preferred gender identity," and refused Plaintiff's demands to do so knowingly, because they do not view her as a ***real*** woman — or for that matter, as deserving of the same rights as non-transgender members of society.

***Alternative 2:  Monell Failure to Train and Failure to take the OIG Report Seriously.***

77. In the alternative, the NYPD's 2018 Response to OIG was not intended literally or seriously: It simply did not tell the truth about what policies were in place.

78. Plaintiff incorporates the full OIG Report by reference, including its findings that:

a.  Although NYPD trainings cover LGBTQ and TGNC issues and corresponding Patrol Guide provisions, not all members of the police force have received this instruction.

b.  Even though NYPD has given out the revised protocols to its uniformed personnel, the Department has not explained to all officers why the changes were necessary or that they specifically apply to TGNC people.

c.  NYPD changed the way it records preferred name on three forms: the Prisoner Pedigree Card, the On Line Booking System Arrest Worksheet, and the Prisoner Movement Slip.   Yet there are a number of other important forms that NYPD uses to document significant police interactions and to identify TGNC victims, complainants, and arrestees that have not been changed to record preferred name. (As discussed below, NYPD may need to consider changes to at least some of these forms as well.)

d.  NYPD does not currently capture and track all LGBTQ-related allegations implicating biased conduct. While the Department has tracked "profiling" complaints ("any action taken or not taken due to bias on the part of the officer") since 2014, this category does not capture other bias allegations pertinent to the LGBTQ community, such as violations of some Patrol Guide revisions.  Even the new "Offensive Language: Gender Identity" and "Offensive Language: Sexual Orientation" classifications, as titled, do not fully capture potentially biased conduct.  ***Notably, NYPD has not substantiated any allegations of profiling since it created that category in 2014.***

e. NYPD's current complaint system limits the Department's ability to detect violations of the revisions, perform internal assessments regarding the possible existence of biased policing issues affecting the LGBTQ community, and adopt policies and implement training to reduce instances of discrimination.

OIG Report at 5-6 (emphasis added).[24]

79. Indeed, as OIG found, while "while 'strip searches solely to determine gender'" — a common complaint — are prohibited, NYPD does not track alleged violations of this rule.

80. And the fact that the NYPD has not sustained a *single* allegation of profiling since 2014 is obvious evidence that its system of discipline does not work.

81. The OIG Report put NYPD on notice that, absent changes to its policies and practices, to a moral certainty, constitutional violations would continue.

82. Despite that, the NYPD — as put in writing in the 2018 Response to OIG — decided its current policies were fine, since they nominally addressed issues, and declined to make any meaningful changes.

**OTHER DOCUMENTS AND FACTS PLAINTIFF INCORPORATES BY REFERENCE**

83. Plaintiff incorporates by reference the facts contained in the reports that have been issued concerning Defendants' responses to the summer 2020 protests, including, *inter alia,* the report issued by the New York City Corporation Counsel and the report issued by the New York City Department of Investigation.[25]

---

[24] The full report is available at https://www.nyc.gov/assets/doi/press-releases/2017/nov/31_LGBTQ_ReportRelease_112117.pdf

[25] Margaret Garnett, Commissioner, New York City Department of Investigation*, Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

84. Plaintiff incorporates by reference the factual allegations in other federal civil rights complaints in cases pending in the United States District Court for the Southern District of New York arising from Defendants' responses to the summer 2020 protests:

  a. *Sow et al v. City of New York et al,* 20-cv-00533(CM)(GWG);

  b. *People of the State of New York v. City Of New York et al*, 21-cv-322 (CM)(GWG);

  c. *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG);

  d. *Sierra et al v. City of New York et al*, 20-cv-10291 (CM)(GWG);

  e. *Wood v. De Blasio et al*, 20-cv-10541 (CM)(GWG);

  f. *Yates v. City of New York, et al.,* 21-cv-01904 (CM)(GWG);

  g. *Campbell v. City of New York,* 21-cv-04056 (AJN); and

  h. *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (Unassigned).

85. Plaintiff incorporates by reference the factual allegations in other federal civil rights complaints in cases pending in the United States District Court for the Eastern District of New York arising from Defendants' responses to the summer 2020 protests:

  i. *Ezagui v. City of New York et al.*, 20-cv-06360 (DG)(SJB);

  j. *Fraser v. City of New York et al.*, 20-cv-05741 (NGG)(MMH);

  k. *Gelbard et al. v. City of New York et al*, 20-cv-03163(MKB)(RER);

  l. *Jefferey et al. v. City of New York et al.*, 20-cv-02843 (NGG)(RML);

  m. *Richardson and Myrie v. City of New York et al*., 21-cv-03609 (LDH)(SJB);

  n. *Smith v. City of New York et al*., 21-cv-03096 (DG)(TAM); and

  o. *Zayer v. City of New York et al.*, 20-cv-06070 (ARR)(PK).

**PLAINTIFF LUCY YORK'S EXPERIENCE**

86. On July 24, 2021, Ms. York attended a protest at or near 1083 Broadway in Brooklyn, NY, demonstrating against the NYPD's eviction of a mutual aid group that was stationed at that address's storefront.

87. Ms. York arrived at the site of the protest, which was already underway upon her arrival, at or around 2:00 p.m.

88. At the time of Ms. York's arrival, there were already NYPD members present, as well as several police cars on the street.  The street was open to the public.

89. Within minutes of Ms. York joining the group, additional members of the NYPD arrived on-scene, cordoned off the street, came onto the sidewalk, and then surrounded the group of protestors on all sides.

90. NYPD played an LRAD recording stating that protesters must disperse.

91. At that time, the majority of protesters — including Ms. York — were on the sidewalk.

92. Ms. York was trapped and surrounded by NYPD members on the sidewalk.

93. Ms. York could not disperse in any way — NYPD officers blocked all egress.

94. That practice was part and parcel of a longstanding NYPD practice and training not to provide meaningful opportunities for anti-police protesters to disperse.  *See, e.g., In re N.Y.C. Policing During Summer 2020 Demonstrations*, No. 20-cv-8924 (CM)(GWG), 2021 U.S. Dist. LEXIS 128437, at *47 (S.D.N.Y. July 9, 2021) (describing the curfew order as "explicitly requir[ing]" an order to disperse before any arrests are made); *Gavin v. City of N.Y.*, No. 20-CV-8163 (JPO), 2021 U.S. Dist. LEXIS 159908, at *10 n.3 (S.D.N.Y. Aug. 24, 2021) (describing the "common-sense conclusion that [NYPD] must give protesters an opportunity to comply with their orders before they start making arrests" for failure to comply with those orders, and the "history of [NYPD] misconduct" on that front).

95. The York Defendants were part of the group of officers surrounding or participating in trapping the group of protesters.

96. Defendant Garcia pushed Ms. York.

97. Ms. York verbally expressed her inability to move to Defendant Garcia, who ignored this information and continued pushing Ms. York on her shoulders and chest.

98. Ms. York walks with the assistance of a cane due  for medical reasons.She had her cane with her on July 24th, which was visibly obvious to anyone who saw her.

99. Because Defendant Garcia would not stop pushing her, Ms. York became acutely afraid of the risk of falling over.

100.   Therefore, as a last resort, Ms. York held her cane horizontally across her body to act as a barrier between herself and Defendant Garcia, in hopes of deterring him from continuing to push her.

101.   At some point, upon information and belief, an NYPD supervisor gave a command to arrest the protesters.

102.   Defendants Garcia, Quevedo, and Doe 1b grabbed Ms. York and threw her onto the street.

103.   Due to the sheer force of the assault, Ms. York lost hold of her cane and landed on the ground, hard, with her right elbow, right shoulder, and right knee taking the brunt of the impact.

104.   Upon information and belief, Defendant Garcia applied zip-tie plastic handcuffs to Ms. York, who was lying on the ground, facedown, with her hands behind her back.

105.   Initially those cuffs were applied appropriately.

106.   After being handcuffed, Ms. York was picked back up off the ground by NYPD members who she could not see.

107.    A few minutes later, Ms. York was slammed into the side of a car by Defendants Giron,

Schivek, and Quevedo.

108.    Defendant Giron then searched Ms. York inside the front of her pants, where his hand

touched and grazed against her genitals through her underwear multiple times.

109.    Ms. York cried and spoke up, stating that she was a transgender woman being

inappropriately searched by male officers.

110.    More specifically:

111.    On October 23, 2023, Officer Giron reached inside the front of Plaintiff's pants, either

through her pockets or through her waistband, to conduct a search.

112.    Officer Giron's search involved physical contact with Plaintiff's genitals through her

underwear.

113.    Officer Giron's search involved a pat down of Plaintiff's groin. Officer Giron conducted

his search underneath Plaintiff's pants.

114.    Plaintiff verbally announced that she was a trans woman who did not consent to being

searched by male officers.

115.    Specifically, she she says, "I'm fucking trans," and asked why they were putting their

"hands down there."

116.    Likewise, she says, "look at my shirt, I've got fucking tits."

117.    Likewise, she says, "I'm a trans woman."

118.    She asks, "Why are you fucking touching me like that?"

119.    Officer Giron in fact heard those complaints, as did the other Defendants.

120.    Plaintiff's complaints were made at a loud enough volume that they should have been heard

by anyone within earshot, including Officer Giron.

121.    Officer Giron continued to search Plaintiff by reaching around inside the front of her pants.

122.    Officer Giron responded to Plaintiff's first set of complaints by stating, "hold on, hold on, hold on."

123.    Officer Giron continued a physical search of Plaintiff's groin and genital area after saying "hold on."

124.    Officer Giron also continued a pat down search after saying "hold on."

125.    Counting from Plaintiff's complaint in video Defendants produced as DEF_000074 at 7:52-54, in which she identifies herself as a transgender woman, Officer Giron's search of Plaintiff continued for at least 25 more seconds.

126.    Defendant Giron violated written NYPD policy as set out above.  As set out above, either:

    a.    Defendant Giron deliberately and maliciously violated NYPD policy in order to sexually grope Plaintiff; or

    b.    Defendant Giron was acting in keeping with unwritten City policy and practice, long established by among other things, a total failure to ever discipline even the worst sexual harassment of transgender people.

127.    Defendant Giron ignored Plaintiff's complaints and cries, ridiculed her, and continued his search.

128.    Despite being a supervisor well-trained and with actual knowledge of the NYPD policies and myriad rights Defendant Giron was violating, neither Defendant Sgt. Quevedo or Defendant Assistant Chief Gulotta spoke or acted in any way to intervene in this unlawful and invasive search.

129.    Neither did any of the other Defendants.

130.    Each Defendant had a lengthy opportunity to prevent Defendant Giron's illegal conduct and deliberately chose to do nothing.

131.    Each Defendant, as set out in "alternative 1" above, had *extensive* training — both in service, in the academy, and through many memos and other documents transmitted to them — telling them that Defendant Giron's conduct was wrongful and illegal.

132.    Defendantsthen placed Ms. York in an NYPD transport vehicle, where she sat waiting for approximately 30 minutes, while other arrestees were loaded in.

133.    In connection with the search and placing Ms. York in the van, in retaliation for Ms. York's complaints (based upon the timing, which permits an inference of causation), the Doe Defendants punitively tightened the cuffs in an extraordinarily tight manner.

134.    Defendants failed to place their finger in the cuffs to ensure sufficient space.

135.    Defendants acts of using tightened cuffs as a punishment, and failing to use a finger-spacing technique while applying or tightening cuffs, violate written NYPD policy.

136.    However, both actions were consistent with and based upon the de facto practice of using flexcuffs as a means of punishment during the 2020 protests, as described elsewhere herein.

137.    Immediately, Ms. York began to lose feeling in her hands.

138.    Ms. York immediately experienced escalating discomfort and excruciating pain from the excessive tightness of the cuffs.

139.    Ms. York repeatedly stated that the handcuffs were on too tight.

140.    Upon information and belief, the Defendants who applied them and other Defendants heard those complaints.

141.    Those Defendants chose to ignore those complaints.

142.    Ignoring complaints that cuffs are too tight violates written NYPD policy.

143.    Written NYPD policy provides that when an arrestee complains about handcuff tightness, an officer must either replace/loosen flexcuffs, or switch to metal handcuffs if they believe the arrestee is not being cooperative and/or being deceptive.

144.    NYPD practice during the 2020 protest was not to supply individual officers with the tools needed to loosen or remove flexcuffs.

145.    Ms. York was fortunate enough not to contract COVID-19 from anyone she was forced to be in close contact with on the van — though she faced stress, fear, and other emotional damage from the careless way Defendants exposed her to a deadly virus.

146.    It was stifling hot inside the vehicle as the temperature outside was in the 90s that day and the air conditioning in the van was not turned on.

147.    Ms. York was eventually taken to the 72nd precinct in East New York.

148.    The 72nd precinct is a place of public accommodation.

149.    After waiting in line to be checked in, Ms. York was fingerprinted, photographed, and brought to a cell, where she remained for several hours.

150.    While at the 72nd precinct, a man was brought into her cell, despite Ms. York making it explicitly clear that she identified as — and is — a woman.

151.    Transgender women, as a matter of fact and law, are women.

152.    Ms. York is a woman.

153.    Throughout the course of Ms. York's arrest, despite her making it clear that she identified as and is a woman, NYPD members misgendered Ms. York by using he/him pronouns to describe her, again engaging in the exact conduct detailed in the OIG Report.

154.    While she waited to be released, Ms. York repeatedly asked members of the NYPD for water because she felt severely dehydrated and began experiencing nausea as well as a pounding headache.

155.    Despite multiple requests, she was only given a single, small cup of water.

156.    At or around 11:00 p.m., Ms. York was released with a Desk Appearance Ticket.

157.    Ms. York was later advised that the criminal charges pending against her were adjourned in contemplation of dismissal, and eventually dismissed.

158.    The Defendants' conduct directly and proximately caused physical and emotional injury to Ms. York, including anxiety and damage to her wrists, right knee, right elbow, and right shoulder.

### NYPD'S PERMISSIVE RESPONSE TO PRO-POLICE AND OTHER, SIMILAR DEMONSTRATIONS

159.    The NYPD's violent response to this protest against police brutality was dramatically different from their response to other kinds of protests and rallies.

160.    On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[26]

161.    On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both

---

[26] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights.

Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[27]

162.    In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[28]

163.    On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[29]

164.    On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her and police threw her to the ground.[30]

---

[27] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.

[28] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.

[29] AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

[30] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges, Gothamist*, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

165.    On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a

bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked

traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were

stationed outside the bar, it was reported that no arrests or summons were issued.[31][32]

166.    The NYPD has a history of treating even right-wing extremists more permissively. This

pattern can be observed from the 1990s to the present.

    a.    In the early 1990s the NYPD stood by and took no action when a group of
skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New
York*, 985 F.2d 94 (2d Cir. 1993).

    b.    In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate
Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor
Dinkins's call for a Civilian Complaint Review Board. This led to one of the
biggest riots in New York City history. On-duty police officers who were present
did little to stop it, and even encouraged it, despite the fact that the off-duty
rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts
of vandalism, and assaulted bystanders.[33][34]

    c.    More recently, the NYPD has turned a blind eye to violence committed by the
Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a
mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs
and kicked and stomped a person laying on the sidewalk. NYPD officers observed
the violence, but did not intervene to stop it. Instead, the NYPD was more
concerned with controlling left-wing activists.[35] During this incident three left
wing activists were arrested but not a single Proud Boy was questioned or
arrested. Proud Boy leader Gavin McInnes boasted about the incident that the
group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[36]

[31] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

[32] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid-orders-once-again/2762850/

[33] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson

[34] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/

[35] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video

[36] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

**THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS**

167.    The extensive deprivations of constitutional rights suffered by Plaintiff here are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, inter alia, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

168.    The NYPD response to the protests in New York City the summer of 2020 was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

169.    For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray, riding horses into crowds and batons strikes to disperse protestors, and kettling to move protestors from specific locations to effectuate mass arrests.[37]

170.    The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of kettling tactics, excessive force and mass arrests, and excessive and unreasonable detention.[38]

---

[37] *See, e.g.*, N.Y. Civil Liberties Union, Arresting Protest (2003), *available at* https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.

[38] *See, e.g.*, N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.

171.   The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.39

172.   Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers, as well as kettling tactics to move protestors or initiate mass arrests.40

173.   Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

174.   Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as has the Plaintiff in this case.

175.   In many of these cases Defendants employed tactics developed and modified over the course of many years by Defendants Shea, Monahan, and their predecessors and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

   a.   *Mandal v. City of New York.,* 02-cv-1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,"* No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 02-cv-6537

---

39 *See, e.g., Callaghan v. City of New York*, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
40 *See People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

(WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on plaintiffs' Fourteenth Amendment Equal Protection and First Amendment-based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b.   *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c.   *Allen v. City of New York*, 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Defendant Monahan, arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d.   *Haus v. City of New York*, 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

e.   *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest;

f.   *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of*

*New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz*, 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g.   *Callaghan v. City of New York,* 07-cv-9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein));

h.   *Osterhoudt v. City of New York, et al.*, No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i.   Despite (then-Mayor Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and responsible,"[41] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶

---

[41] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j.       In *Peat v. City of New York,* No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,[42] encircled them on three sides and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

k.       Other OWS-related cases have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial: *Packard* v. *City of New York* 15-cv-7130 (S.D.N.Y.) (AT) and *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;*

l.       The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14-cv-9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including *Monell* claims with much in common with many of those raised herein. *See Case v City of NY*, 233 F. Supp. 3d 372 (SDNY 2017); 408 F.Supp.3d 313 (SDNY 2019);

m.      The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, failure to provide reasonable dispersal orders and opportunity to disperse, unnecessary and excessive force used on protesters and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v NYC*, 13-cv-(RWS); *Crisp v. NYC,* 12-cv-5482(RWS); *Dedrick v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992(RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

n.       Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case,*

---

[42] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on protester activity and engaging in a manner to obstruct protester's ability to engage in First Amendment activity and identified how executive "supervising officers, at random and without warning, pointed to protesters they wanted arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." https://www.nyclu.org/en/nyc-free-speech-threat-assessment.

*Peat,* the Union Square Litigations, as well *as* several other OWS-related cases, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

o.   The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled *Arresting Protest*, published April 2003, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protest.pdf;

p.   The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled *Rights and Wrongs at the RNC*, published in 2005, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

q.   The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

r.   *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

### THE NYPD'S FAILURE TO TRAIN REGARDING PROTEST POLICING

176.   Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

177.   In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

178.   In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

32

179.    Upon information and belief, to this day, that document forms the core the NYPD protest response-related training.

180.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

181.    Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

182.    These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of the Plaintiff in this case.

183.    Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

184.    However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

185.    On information and belief, there was, and is, virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

186.    Defendants' failures to train, which led to violations of Plaintiff's rights in this case, include, *inter alia,* the following:

    a.    The failure to train, instruct, and discipline officers to discourage and prevent sexual abuse, misconduct, and assault by NYPD members.

    b.    The failure to make clear the need provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

    c.    The failure to convey the clear guidance that jail support workers were essential workers;

    d.    The failure to make clear the need for individualized probable cause to arrest in a protest context;

    e.    The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

    f.    The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters; and

    g.    The failure to provide training on the importance and need for NYPD members to wear masks during the COVID-19 pandemic, to provide masks for arrestees, and to allow arrestees to engage in mask-wearing, social distancing, handwashing, and other, similar safety measures in light of the COVID-19 pandemic.

187.    Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

188.    The SRG, deployed around the City at protests in 2020 including those that are the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

189.   The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

190.   In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests. Their response is single-fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."[43]

191.   However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

192.   Many SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits.[44]

193.   SRG members are meant to have additional DCU training.

194.   Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

195.   However, many of the officers deployed to respond to the protests in 2020 did not even receive *that* training, which was supposedly required of them.

196.   As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy."[45]

---

[43] Ben Yakas, *NYPD: Fine, Maybe We Won't Police Protests With Machine Guns*, Gothamist, Jan. 30, 2015, *available at* https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.
[44] Ali Winston, *NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct* Histories, The Appeal, Oct. 15, 2020, *available at* https://theappeal.org/nypd-srg-misconduct/.
[45] OCC Report at 37.

197.    Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control
        and protest policing tactics have been on full display in the streets of New York City; the
        subjects of unfavorable coverage in the media, including coverage explicitly showing video
        evidence of NYPD members engaging in uses of excessive force in connection with crowd
        control while policing protests; documented in complaints to the Civilian Complaint Review
        Board and other agencies; as well as the litigations discussed above, which have cost the city
        tens of millions of dollars in judgments and settlements.

198.    Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing
        operations, NYPD supervisors - including DCU supervisors charged with designing and
        implementing NYPD protest policing-related policies and related training – routinely created
        "after action reports" that documented and critiqued NYPD plans for and responses to protest
        activities.

199.    For example, in a March 17, 2006 *New York Times* article that was published while
        discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police
        Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002
        WEF after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03-cv-2829
        (KMW) (GWG) (SDNY).[46]

200.    Those reports praised employing militarized tactics such as the "staging of massive
        amounts" of officers in riot gear including riot helmets and militarized "equipment" such as
        armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause

---

[46] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest," N.Y. Times, March 17, 2006, available at
https://www.nytimes.com/2006/03/17/nyregion/police-memos-say-arrest-tactics-calmed-protest.html.

them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protesters.

201.    After the 2002 WEF after-action reports were disclosed in *Allen* and the 2004 RNC-related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

202.    For example, according to the Corporation Counsel's report, NYPD records do not show any protest-related after action reviews undertaken between the 2004 Republican National Convention until the events of the George Floyd protests.

203.    Nevertheless, upon information and belief, at all times relevant herein, City officials including de Blasio, Shea, Monahan, and other defendant City policymakers, routinely received reports regarding arrests made in connection with First Amendment assemblies, including through internal reports such as Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

204.    Despite the wealth of evidence of NYPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including

information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

205.    For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.) (AT), a witness for the City of New York testified that in regard to protest police training it did not review (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

206.    As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

207.    For example, in a 2017 deposition, a Fed. R. Civ. P. 30(b)(6) witness designated to testify on sidewalk policy protesting, dispersal orders, and training on probable cause standards for crimes commonly charged in protest policing by the Defendant City could identify no impact that litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or NYPD training.

208.    Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."[47]

209.    At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests— despite having received clear notice that NYPD policing of protests has caused the systemic

---

[47] OCC Report at 2, 30.

violations of protesters' constitutional rights for years—demonstrates both a history and a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights of Plaintiff and other similarly injured protesters.

### THE NYPD'S POLICY AND/OR PRACTICE
### OF USING EXCESSIVE FORCE TO CONTROL THE SPEECH OF PROTESTORS

210.    Defendants used types and levels of force that were excessive and unnecessary force against the Plaintiff.

211.    In many cases, those uses of force were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

212.    In many cases, Defendants failed to document, and/or require that fellow Defendants and/or other fellow officers document, uses of force in accordance with related NYPD policies and/or training.

213.    In many cases, Defendants used force against Plaintiff based on her position in or proximity to a perceived group, as well as the perception that she would be providing aid to that group, without first having given the perceived group clearly communicated prior notice as well as a meaningful opportunity to comply with police orders and/or dissociate with the perceived group.

214.    In many cases, Defendants used types of force that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances.

### DEFENDANT CITY'S POLICIES AND PRACTICES
### REGARDING ARRESTS—INCLUDING MASS ARRESTS—WITHOUT FAIR
### WARNING

215.     Defendant City had a policy, practice, and/or custom in the summer of 2020 of engaging in arrests, including mass arrests, without first providing fair warning.

216.     Defendant City had a policy, practice, and/or custom in the summer of 2020 in engaging in arrests, including mass arrests, for purported violations of the Curfew Orders, without first having provided a clearly communicated and lawful dispersal order, followed by a meaningful opportunity to disperse, and an actual refusal to disperse, prior to taking enforcement action.

217.     In many cases, even where NYPD members did give dispersal orders, they did not then provide a means of egress or other meaningful opportunity to comply.

218.     In some cases, like Plaintiff's, Defendants seized protesters and those associated with them, based on the perception that they were part of a perceived group, without having made an individualized determination that there was probable cause to arrest the Plaintiff in question based on her own, individual conduct, as opposed to the perceived "group conduct" — or based on perception that people like Plaintiff were associated with those advancing an anti-police message, which Defendants intended to chill.

219.     In some cases, like Plaintiff's, Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

220.     That enforcement was consistent with widespread NYPD policy, practice, and/or custom related to the 2020 protests.

221.     Additionally, in some cases, like Plaintiff's, Defendants enforced other provisions of New York law against Plaintiff and other perceived protesters without probable cause and/or

without first having given constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests.

222. In some cases, Defendants employed a crowd control tactic in which Defendants pushed and/or corralled and/or otherwise physically trapped perceived groups including Plaintiff and other perceived protesters, including by kettling, without first having given Plaintiff and the others so pushed and/or corralled and/or trapped meaningful notice and an opportunity to disperse or otherwise change their conduct in order to avoid being so pushed and/or corralled and/or trapped.

**DEFENDANTS' PROTEST ARREST PROCESSING POLICIES AND PRACTICES**

223. Because Defendants arrested Plaintiff and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, which involved, among other components, placing Plaintiff and other arrestees in flex-cuffs or overtight metal cuffs and removing them from the street to a centralized arrest processing location such as a Mass Arrest Processing Center ("MAPC"), where Defendants subject them to large-scale arrest processing procedures and Mass Arrest Processing Plan ("MAPP") rather than issuing them summonses, and releasing them from custody, on the street.

224. Additionally, as a result, instead of detaining Plaintiff and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants subjected Plaintiff to overtight metal handcuffing as well as unreasonably lengthy, onerous arrest processing, significantly increasing the amount of time they would otherwise have been in custody and exposing them to inappropriate and especially hazardous conditions of confinement, as well as searches of their persons and property, and/or seizures and/or

retentions of their property without adequate pre- or post-deprivation notice and/or opportunity to be heard to challenge the grounds for seizing and/or retaining the property.

225.    In some cases, NYPD members destroyed and/or damaged property belonging to Plaintiff and other arrestees.

226.    In other cases, NYPD members seized and retained property from arrestees without providing them with the NYPD paperwork required by NYPD policies, practices, and procedures to retrieve property seized by NYPD members.

227.    In still other cases, NYPD members seized and retained property without providing arrestees with a meaningful opportunity to retrieve it, for example because the location at which Defendants were retaining the property was closed.

228.    Beyond that, in some cases, Defendants arrested arrestees, including Plaintiff, for alleged offenses which New York Criminal Procedure Law § 150.20 required them to grant Plaintiff summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a C-Summons.

229.    The conditions of Plaintiff's confinement were unsafe and overcrowded, particularly in the context of the COVID-19 pandemic, and/or filthy and/or unsanitary; and lacked appropriate access to phone calls, food, water, bathrooms soap and/or hand sanitizer, other hygienic products such as tampons, and/or other basic necessities.

230.    With particular respect to the COVID-19 pandemic, during Plaintiff's confinements, the State of New York, and Defendant City, had advised people to comply with social distancing, to wear masks, and to engage in practices such as hand-washing; and Defendant City, as well

as Defendants Shea, Monahan, and other NYPD members, enforced Executive Orders issued by Mayor de Blasio requiring people to engage in social distancing and/or mask-wearing, all on an emergency basis.

231. However, as part of Defendants' Protest Arrest Processing Policies and MAPP, instead of detaining Plaintiff and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants transported Plaintiff to a MAPC or other centralized arrest processing location, in close, forced proximity to other arrestees and NYPD members, many of whom were not wearing masks, rendering social distancing impossible.

232. Relatedly, many Defendants and other nearby NYPD members were not wearing masks while arresting and/or using force on and/or detaining Plaintiff.

233. Also relatedly, Defendants and other NYPD members removed masks many Plaintiff and other arrestees who had masks at one point prior to or during their arrests or detentions.

234. Also as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected Plaintiff and other arrestees to conditions of confinement in which they were unable to wash their hands or otherwise engage in other, similar hygienic practices that the State and City were recommending for public health and safety.

235. Defendants knew or should have known that, as a result of subjecting Plaintiff to Defendants' Protest Arrest Processing Policies and MAPP, they would deprive Plaintiff and other arrestees of basic needs, including for example the need to stay safe from COVID-19, as well as unreasonable risks of serious damage to their physical and/or mental health or safety through potential exposure to COVID-19.

236. During Plaintiff's time in NYPD custody, Defendants deprived Plaintiff of meaningful access to food, bathroom, soap and other hygiene products, and other basic necessities for an

extended period of time, and subjected Plaintiff to filthy, crowded, and unsanitary conditions of confinement.

237. Defendants acted intentionally to impose those conditions because they subjected Plaintiff to Defendants' Protest Arrest Processing Policies and MAPP.

238. Additionally, Defendants recklessly failed to act with reasonable care to mitigate the risks that the conditions posed even though they knew or should have known that they posed excessive risks to Plaintiff's physical and/or mental health or safety through potential exposure to COVID-19.

239. Moreover, the risks were obvious and apparent, including based on the State and City policies and practices related to COVID-19 safety, and common sense.

## DEFENDANTS' HISTORICAL FAILURES TO MONITOR AND SUPERVISE NYPD MEMBERS' PROTEST POLICING

240. Although Defendant City — including through and by officials like de Blasio, Shea, Monahan, and other policymakers — actually knew, or should have known, that NYPD members were engaging in or had engaged in the unconstitutional conduct complained of herein, they failed to monitor, supervise, and/or discipline NYPD members who directed, engaged in, or observed such conduct.

241. For example, despite statements made by de Blasio and Shea in the media indicating they had knowledge of events related to violence and mass arrests at the protests as they were unfolding, and the wealth of video and other evidence that has been widely available in the intervening months, upon information and belief, virtually no NYPD members have been meaningfully investigated or disciplined related to their conduct.

## STATE AND CITY OFFICIAL REPORTS ON THE SUMMER 2020 PROTESTS

242.    In July 2020, the New York State Office of the Attorney General (the "AG") issued a preliminary report on the NYPD's response to the May and June protests ("AG Report").[48]

243.    The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observers, elected officials, and essential workers.

244.    The AG Report also found the pervasive failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

245.    In December of 2020, the NYC Department of Investigation issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").[49]

246.    The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[50]

247.    In addition to noting the heavy-handed response by the SRG at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[51]

---

[48] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, ("AG Report"), July 2020, available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf. The Plaintiff herein incorporates by reference into this case the facts set forth in the AG Report.
[49] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.
[50] *Id.* at 36.
[51] *Id.* at 61.

248.    The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to peaceful First Amendment expression.

249.    The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

250.    The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

251.    According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[52]

252.    The DOI also found that Black arrestees were disproportionately charged with felonies.[53]

253.    The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[54]

254.    According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[55]

255.    Defendant City and NYPD leadership and policymakers knew the department and its officers had problems with constitutionally policing protests but failed to adequately train and otherwise prepare its officers to respond to the 2020 protests, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

**FIRST CLAIM FOR RELIEF**

---

[52] *Id.* at 26.
[53] *Id.* at 27.
[54] DOI Report at 56.
[55] *Id.* at 28.

**Unlawful Seizure / False Arrest**

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

256.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

257.    Defendants' seizure of the Plaintiff herein was done without any judicial warrant authorizing them to seize Plaintiff, was unreasonable, and was done without privilege or lawful justification.

258.    Plaintiff did not consent and was conscious of her confinement by Defendants.

259.    Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiff.

260.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

261.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

**Excessive Force**

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

262.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

263.    Defendants' use of force against Plaintiff was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

47

264.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

265.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### THIRD CLAIM FOR RELIEF

**First Amendment**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution*

266.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

267.     Defendants (a) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in falsely arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff, in subjecting Plaintiff to Defendants' Protest Arrest Processing Policies, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

268.     In addition to being retaliatory, the restrictions Plaintiff complains of herein, which Defendants imposed on Plaintiff's First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiff's protected conduct that:

a.   Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

b.   Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened; and/or

c.   Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d.   Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

269.   As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

270.   The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### FOURTH CLAIM FOR RELIEF

**First Amendment Retaliation**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution***

271.   Defendants retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment.

272.   Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech, conduct, and/or associations.

273.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech, conduct, and/or associations.

274.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct and associations in the future.

275.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of her First Amendment rights.

276.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

277.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiff.

278.    Upon information and belief, Defendants did not subject other protesters expressing "Blue Lives Matter" or other, similar, pro-police messages who were similarly situated to Plaintiff in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

279.   Additionally, some of the offenses charged against Plaintiff, which Defendants might argue provided probable cause for Plaintiff's' arrest, were offenses that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with.

280.   Plaintiff suffered actual chill, including in that Plaintiff was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on her protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

281.   Additionally, in many cases, Defendants apparently permitted, acquiesced in, and/or facilitated the speech and/or other expressive conduct in which Plaintiff was engaging, before suddenly using force and/or making arrests, without first having given reasonable notice that such force and/or arrest activity would result if Plaintiff did not conduct themselves differently and/or disperse, as well as a meaningful opportunity to comply.

282.   Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and detaining Plaintiff subjected Plaintiff to the violations of her First Amendment rights described elsewhere herein.

283.   As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

284.   The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

**Due Process**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution***

285.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

286.    As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiff violated her Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning.

287.    Additionally, as discussed elsewhere herein, Defendants City, including by its officials like de Blasio, Shea, and/or Monahan, designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing and/or retaining Plaintiff's property and/or detaining Plaintiff in the conditions as described subjected Plaintiff to the violations of her Due Process rights described elsewhere herein.

288.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

289.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

<u>**SIXTH CLAIM FOR RELIEF**</u>

**Equal Protection and Selective Enforcement**

52

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fourteenth Amendment to the United States Constitution***

290.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

291.     As described above, in many cases, Defendants arrested Plaintiff for alleged offenses in connection with which C.P.L. § 150.20 required that Plaintiff receive summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

292.     However, because Defendants arrested Plaintiff and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, rather than issuing them summonses, and releasing them from custody, on the street, while Defendants did not apply those same Protest Arrest Processing Policies to other similarly situated arrestees.

293.     Additionally, as discussed elsewhere herein, Defendant City, through officials including de Blasio, Shea, and/or Monahan, designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and/or detaining and/or prosecuting Plaintiff subjected Plaintiff to the above-described violations of Plaintiff's Equal Protection rights.

294.     Additionally, as set out above, Defendants' conduct discriminates against and treats transgender people differently than similarly situated others.

295.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

296.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### SEVENTH CLAIM FOR RELIEF

#### Deprivation of Fair Trial Rights

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution***

297.    Plaintiff incorporates by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

298.    Defendants fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which Plaintiff suffered liberty deprivations and other injuries.

299.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

300.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### EIGHTH CLAIM FOR RELIEF

#### Malicious Prosecution

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution*

301.    Plaintiff incorporates by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

302.    Upon information and belief, Defendants misrepresented and falsified evidence to the prosecutor and/or failed to make a full statement of the relevant evidence – including potentially exculpatory evidence - to the prosecutor.

303.    Defendants were directly and actively involved in the initiation or prosecution of criminal proceedings against Plaintiff, including by supplying and creating false information to be included in NYPD paperwork that was included in NYPD paperwork, providing falsely sworn information in accusatory instruments, and/or providing false information to the prosecutor.

304.    Defendants lacked probable cause to initiate and continue criminal proceedings against Plaintiff.

305.    Defendants acted with malice in initiating criminal proceedings against Plaintiff.

306.    Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiff were favorably terminated on the merits.

307.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

308.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**NINTH CLAIM FOR RELIEF**

**Municipal Liability**

*Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution*

309.   Plaintiff hereby incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

310.   The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiff to, including, but not limited to: uses of excessive force, and sexual battery, and unlawful detention, and unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair warning; employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protesters, without fair warning; engaging in retaliatory and selective enforcement of the criminal laws against perceived participants in First Amendment assemblies, particularly Black Lives Matter and/or anti-police brutality protests, in the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations as to their perceived violations, without fair warning; using flex-cuffs or overtight metal cuffs for protest-related arrests, while failing to supply officers with protective padding and adequate numbers of cutting tools to loosen or remove flex-cuffs, and/or to ensure that such cutting tools are readily available when needed; failing to loosen or remove over-tight cuffs; and subjecting arrestees to lengthy detentions and lengthy detentions and arrest processing at centralized arrest processing locations, exposing them to searches, property seizures, and unhealthy and conditions of confinement, in lieu of brief street detentions.

311.   That set of policies and practices added up to an atmosphere of total lawlessness among the NYPD:  open season was declared on anti-police protesters and anyone — like Plaintiff — who dared to associate with them.

312.   As set out above, Defendants arrested Plaintiff entirely without probable cause.

313.   The Defendant City's policies — particularly as reflected in the second FINEST message that glossed over the notice-to-disperse requirement—were designed to encourage, and trained officers to engage in, such willful blindness.

314.   The total lawless atmosphere fostered by Defendant City's policies and practices as set out above sent the message to individual officers that they should feel free to make illegal arrests, like the arrest of Plaintiff, as long as it was connected to anti-police protesting.

315.   Additionally, Defendant City, as detailed above, caused by its policies (1) the sexual assault of Plaintiff and (2) the discriminatory treatment of Plaintiff because she is transgender.

316.   All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including, but not limited to, de Blasio, Shea, and Monahan; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, through its policymaking officials; (d) Defendant City's deliberate indifference to Plaintiff's rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

## **TENTH CLAIM FOR RELIEF**

***Violations of New York State Law Pursuant to the New York State Constitution and New York State Common Law***

317.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

318.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

### **Violations of the New York State Constitution**

319.    Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

320.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiff's rights under those sections.

### **Assault**

321.    Defendants committed assault within the meaning of New York common law against Plaintiff by intentionally placing Plaintiff in fear of imminent harmful or offensive contact.

### **Battery**

322.    Defendants committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiff without Plaintiff's consent.

### **False Imprisonment and Unreasonable Detention**

323.    By the actions described above, the police officials described above did falsely arrest and/or imprison Plaintiff within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiff was conscious of the confinement and it was without her consent.

**Intentional and Negligent Infliction of Emotional Distress**

324.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

325.    By the actions described above, Defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff.

326.    The acts and conduct of the Defendants were the direct and proximate cause of injury and damage to Plaintiff and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

327.    As a result of the foregoing, Plaintiff was deprived of her liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

**Negligent Training and Supervision**

328.    Upon information and belief, Defendant City supervised, and trained the police officials described above.

329.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Excessive Detention**

330.    Defendants deliberately detained Plaintiff for an excessive and unreasonably prolonged period of time.

**Malicious Prosecution**

331. Defendants commenced criminal proceedings against Plaintiff maliciously and without probable cause.

332. All charges were terminated in Plaintiff's favor.

333. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

334. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## ELEVENTH CLAIM FOR RELIEF

### *Violations of New York State Civil Rights Law Section 40-c and 40-d*

335.  Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

336. As detailed herein, Plaintiff was subjected by Defendants to discrimination in a place of public accommodation because of her sex, gender identity, and/or sexual orientation.

337. As detailed herein, Defendants denied Plaintiff the full and equal accommodations, advantages, facilities, and privileges of their facilities on the basis of her sex, gender identity, and/or sexual orientation.

338. As a result of Defendants' acts and omissions, Defendants caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

339.    Plaintiff is therefore entitled to, in addition to all other remedies, the statutory remedies in

Article 4 of the Civil Rights law, including statutory damages.

### TWELFTH CLAIM FOR RELIEF
### VIOLATIONS OF THE NEW YORK CITY HUMAN RIGHTS LAW

340.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above

paragraphs of this Complaint.

341.    New York City Administrative Code § 8-107 (4), in the context of public accommodations,

provides as follows:

> (a) It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent, or employee of any place or provider of public accommodation, **because of the actual or perceived . . . gender . . . [or] sexual orientation** . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof, ordirectly or indirectly, to make any declaration, publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement, to the effect that any of the accommodations, advantages, facilities and privileges of any such place or provider shall be refused, withheld from or denied to any person on account of race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status or that the patronage or custom of any person belonging to, purporting to be, or perceived to be, of any particular race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status is unwelcome, objectionable or not acceptable, desired or solicited.

342.    The New York City Commissioner on Human Rights has also issued official enforcement

guidance      on      "Gender      Identity/Gender      Expression,"      available      at

https://www1.nyc.gov/site/cchr/law/legal-guidances-gender-identity-expression.page.      That

guidance provides, in relevant parts:

> "Gender discrimination is prohibited in employment, housing, public accommodations, discriminatory harassment, and bias-based profiling by law enforcement and exists when a person is treated 'less well than others on account of their gender.'"

*Id*., at Part III, *citing Williams v. N.Y.C. Hous. Auth*., 872 N.Y.S.2d 27, 39 (1st Dep't 2009).

> "The NYCHRL requires employers and covered entities to **use the name**, pronouns, and title (e.g., Ms./Mrs./Mx.) **with which a person self-identifies**, **regardless of the person's sex assigned at birth**, anatomy, gender, medical history, appearance, or the sex indicated on the person's identification."

*Id*. at Part III(1) (emphasis added).

343.    The guidance also provides, as "Examples of Violations," among other things, "Intentional or repeated refusal to use a person's name, pronouns, or title," which should cease when a person, "has made clear" what name or pronouns should be used. *Id*.

344.    Defendants violated the above law because of Plaintiff's actual or perceived gender and sexual orientation in, among other things, how they physically treated Plaintiff, how they housed her during her arrest, and in how they referred to and addressed her.

345.    The City, upon information and belief, lacks the policies and trainings required to prevent violations of the kind Plaintiff experienced.

346.    As a result of Defendants' acts and omissions, Defendants caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

347.    Chapter Five of Title 8 of the Administrative Code creates a private right of action for violations outlined above. *See* N.Y.C. Admin. C. § 8-502(a).


**THIRTEENTH CLAIM FOR RELIEF**
**VIOLATIONS OF THE NEW YORK CITY ADMINISTRATIVE CODE'S BAN ON BIAS-BASED PROFILING**

348.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint.

349.    In relevant part, the New York City Administrative Code provides for a private right of action where "one or more law enforcement officers have intentionally engaged in bias-based profiling of one or more individual." N.Y.C. Admin. C. § 14-151(c)(1).

350.    It also provides a cause of action when certain activities have a disparate impact on certain protected groups that Plaintiff belongs to. *Id.* § 14-151(c)(2).

351.    The Code defines "bias-based profiling" as "an act of a member of the force of the police department or other law enforcement officer that relies on actual or perceived race, national origin, color, creed, age, immigration or citizenship status, gender, sexual orientation, disability, or housing status as the determinative factor in initiating law enforcement action against an individual, rather than an individual's behavior or other information or circumstances that links a person or persons to suspected unlawful activity." § 14-151(a)(1).

352.    As set out above, Defendants engaged in a manual genital "search" not because of any suspected unlawful activity, but in reliance on Plaintiff's perceived gender and/or sexual orientation.[56]

353.    Plaintiff's perceived gender and/or sexual orientation was the determinative factor in Defendants' choice to violate her genitals.

354.    Upon information and belief, and as set out above, the NYPD routinely engages in similar searches.

---

[56] That is, in perceiving a person as trans, people like Defendants often — and on information and belief, did here — make judgments and assumptions about sexual orientation.

355.   Upon information and belief, and as set out above, those practices have a profound disparate impact on transgender people on the basis of their perceived gender and/or sexual orientation.

356.   Plaintiff is therefore entitled to the relief set out in the administrative code:  injunctive and declaratory relief, along with reasonable attorneys' fees and expert fees as part of those attorneys' fees.  § 14-151(d)

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff demands judgment against the individual Defendants and the City of New York as follows:

i.    Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.   Actual damages in an amount to be determined at trial against the City of New York;

iii.  Injunctive and declaratory relief, including under the New York City Administrative Code;

iv.   Statutory attorney's fees, expert fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988, New York State Law, the New York City administrative code, and New York common law; and

v.    Such other relief as the Court deems just and proper.

Dated: New York, New York

June 4, 2024

**GIDEON ORION OLIVER**

277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com

**COHEN&GREEN P.L.L.C.**

By:

Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
    t: (929) 888-9480
    f: (929) 888-9457
    e: elena@femmelaw.com
       remy@femmelaw.com
       jessica@femmelaw.com