**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

LUCY YORK,

                    Plaintiff,

    v.

THE CITY OF NEW YORK, ET AL.,

                  Defendants.

22-cv-6432

**PLAINTIFF'S FIRST REQUESTS FOR
ADMISSION**

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Plaintiff requests that defendants the City of New York, Jorge Garcia, and any defendant who is currently or subsequently named and hereafter represented by the Office of the Corporation Counsel in this action, answer the following requests for admissions ("Requests") under oath and fully in writing within thirty (30) days of service hereof, or such shorter time as the Court orders or the parties stipulate.

## DEFINITIONS

1.     Any capitalized term not otherwise defined herein shall have the meaning assigned to it in the First Amended Complaint (Dkt. No. 29).

2.     "City" and "NYPD" are to be construed to include each other, such that a request for the names of certain New York City Police Department ("NYPD") employees, e.g., should be construed to include employees of any agency of the City of New York.

3.     "Date" means the exact day and time, month, and year if ascertainable, or if not, the best approximation (including relationship to other events).

4.     "Defendants," "You," and "Yours" shall mean the defendants answering these requests for admission.

5.     "Officer" means a member of service of the NYPD, regardless of rank, including but not limited to any and all officers, detectives, sergeants, lieutenants, captains, chiefs, and/or deputy commissioners.

6.     "Person" means any natural person, association, business, group, organization, legal entity, government entity, or other entity.

7.     Defendant John Doe 2 as identified in the complaint is now understood to be Officer Leonel Giron (Shield No. 21368).

8.     Attached as **Exhibit 1**, for reference in some of the Requests, is a February 9, 2018 letter sent by the then-Commissioner and Deputy Commissioner of Legal Matters regarding NYPD's policies specific to (among other things) transgender New Yorkers, responding to the Office of the Inspector General's findings that NYPD fell short in serving that community.

## INSTRUCTIONS

1.     The answers to these requests for admissions shall specifically admit or deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter.

2.     A denial shall fairly respond to the substance of the requested admission.

3.     When good faith requires that a party qualify an answer or deny only a part of the matter to which an admission is requested, the party shall specify the portion that is true and qualify or deny the remainder.  The answering party may assert lack of knowledge or information as a reason for failing to admit or deny **only** if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny.  Further, a

reasonable inquiry necessarily "includes investigation and inquiry of any of defendant's officers, administrators, agents, employees, servants, enlisted or other personnel, who conceivably, but in realistic terms, may have information which may lead to or furnish the necessary and appropriate response. In this connection, relevant documents and regulations must be reviewed as well." *Diederich v Dept. of Army*, 132 FRD 614, 619 (SDNY 1990).

4.      The grounds for objecting to a request must be stated.

5.      A party ***must not*** object solely on the ground that the request presents a genuine issue for trial.

6.      Identify each Person who assisted or participated in preparing and/or supplying any of the information given in a response to or relied upon in preparing the answers to these requests for admissions.

7.      The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The word "including" shall be construed to mean without limitation.  The words "any" and "all" shall be construed so as to make the request inclusive rather than exclusive.

8.      The singular shall include the plural, and vice versa.

9.      Defendants are under a continuing duty to supplement their responses to these discovery requests without further request from Plaintiff.

10.      Because the City is a Defendant, the City's investigation must include inquiry to its "agents, employees, servants, enlisted or other personnel," regardless

of whether those individuals are currently parties. *Herrera v. Scully*, 143 F.R.D. 545, 549–50 (S.D.N.Y. 1992).

11.     The citations to evidence below are not meant to limit the Requests in any way.  Rather, they are intended as a courtesy to assist Defendants in the required investigation.

## <u>REQUESTS</u>

***Documents.***

1.      Lucy York is a woman.

2.      Lucy York is a transgender woman.

3.      Transgender women are women.

4.      Officer Leonel Giron (Shield No. 21368) is a man.

5.      Officer Giron a cisgender man.

6.      On October 23, 2023, Officer Giron reached inside the front of Plaintiff's pants, either through her pockets or through her waistband, to conduct a search.

      a.  DEF_000074 at 7:50-8:00

7.      Officer Giron's search involved physical contact with Plaintiff's genitals through her underwear.

8.      Officer Giron's search involved a pat down of Plaintiff's groin.

9.      Officer Giron conducted his search underneath Plaintiff's pants.

10.     Plaintiff verbally announced that she was a trans woman who did not consent to being searched by male officers.

11.     Specifically, she she says, "I'm fucking trans," and asked why they were putting their "hands down there."

4

    a.  DEF_000074 at 7:52-54.

12.    Likewise, she says, "look at my shirt, I've got fucking tits."

    a.  DEF_000074 at 8:08-8:13.

13.    Likewise, she says, "I'm a trans woman"

    a.  DEF_000074 at 8:06-8:08

14.    She asks, "Why are you fucking touching me like that?"

    *a. Id.* at 8:12-8:16

15.    Plaintiff's complaints were made at a loud enough volume that they should have been heard by anyone within earshot, including Officer Giron.

16.    Officer Giron in fact heard those complaints.

17.    Officer Giron continued to search Plaintiff by reaching around inside the front of her pants.

18.    Officer Giron responded to Plaintiff's first set of complaints by stating, "hold on, hold on, hold on."

    *a. Id.* at 7:55-8:02.

19.    Officer Giron continued a physical search of Plaintiff's groin and genital area after saying "hold on."

20.    Officer Giron also continued a pat down search after saying "hold on."

21.    Counting from Plaintiff's complaint at DEF_000074 at 7:52-54, in which she identifies herself as a transgender woman, Officer Giron's search of Plaintiff continued for at least 25 more seconds.

    a.  *See,* DEF_000074 at 7:52-8:20.

22.     NYPD policy requires that when requested, "a supervisor ***shall*** assign an officer of the gender requested by [an] arrestee" to perform any and all searches when there are not safety concerns (emphasis added).

     *a. See* Exhibit 1 at 11.

23.     Whenever officers depart from such a request, "the factors behind this decision [are supposed to be] recorded in the Command Log."

     a.  Exhibit 1 at 11-12.

24.     Officer Giron did not ask for a supervisor to assign another officer.

25.     NYPD took extensive efforts to train their officers on (among other things) the requirement to respect the requests of transgender arrestees regarding searches.

     a.  Exhibit 1 at 13-14.

26.     NYPD objected to the Office of the Inspector General ("OIG")'s assertions that the NYPD's efforts to train officers on (among other things) the patrol guide provisions regarding searches of transgender arrestees fell short.

27.     Officer Giron received and reviewed the "Training Memo" referenced in the Exhibit 1 at 12-17, whether as part of his in-service training or as part of his academy training.

28.     Officer Giron was trained and repeatedly reminded throughout in service training that "members of service … must treat all individuals in accordance with their preferred gender identity," in a manner that "le[ft] no doubt that the policies apply to gender non-conforming people."

     a.  Exhibit 1 at 13.

29.   No member of the NYPD, including Officer Giron, made any notation in any document recording "the factors behind th[e] decision" to insist on a man (e.g., Officer Giron) conducting the search of Plaintiff.

30.   The manner in which Officer Giron conducted his search of Plaintiff's body violated NYPD policy.

Dated:      October 31, 2023
            Queens, New York


COHEN&GREEN P.L.L.C.


/s/
_____
BY:      J. Remy Green

1639 Centre St., Suite 216
Ridgewood, New York 11385
t : (929) 888-9480

# Exhibit 1



**THE POLICE COMMISSIONER**
CITY OF NEW YORK

February 9, 2018

Honorable Bill de Blasio
Mayor of the City of New York
City Hall
New York, NY 10007

Honorable Corey Johnson
Speaker
The New York City Council
250 Broadway, 18th Floor
New York, NY 10007

Honorable Mark G. Peters
Commissioner
Department of Investigation
80 Maiden Lane
New York, NY10038

Honorable Philip K. Eure
Inspector General
Office of the Inspector General
For the NYPD
80 Maiden Lane
New York, NY 10038

Dear Mayor de Blasio, Speaker Johnson, Commissioner Peters and Inspector General Eure:

Pursuant to Local Law 70 and the New York City Charter, the New York City Police Department hereby submits its response to the November 21, 2017 report of the Office of the Inspector General for the NYPD, entitled "Review of NYPD's Implementation of Patrol Guide Procedures Concerning Transgender And Gender Nonconforming People."

Sincerely,

James P. O'Neill
Police Commissioner

 POLICE DEPARTMENT

February 9, 2018

Honorable Bill de Blasio
Mayor of the City of New York
City Hall
New York, NY 10007

Honorable Corey Johnson
Speaker
The New York City Council
250 Broadway, 18th Floor
New York, NY 10007

Honorable Mark G. Peters
Commissioner
Department of Investigation
80 Maiden Lane
New York, NY 10038

Honorable Philip K. Eure
Inspector General
Office of the Inspector General
For the NYPD
80 Maiden Lane
New York, NY 10038

Dear Mayor de Blasio, Speaker Johnson, Commissioner Peters, and Inspector General Eure:

Pursuant to Local Law 70 and the New York City Charter, the New York City Police Department ("NYPD" or the "Department") hereby submits its response to the November 21, 2017 report of the Office of the Inspector General for the NYPD ("OIG") entitled "Review of NYPD's Implementation of Patrol Guide Procedures Concerning Transgender and Gender Nonconforming People" (the "Report").

1

**I.**   **INTRODUCTION: THE NYPD'S COMMITMENT TO THE LGBTQ COMMUNITY**

Vital to the NYPD's overall mission of protecting and serving the citizens of New York City is the development of partnerships with the diverse communities it serves. The Department is, therefore, committed to serving and meeting the needs of the City's LGBTQ community with sensitivity, equity, and effectiveness, including the concerns of gender non-conforming individuals.   To underscore this commitment, the NYPD continually seeks to enhance its relationship with the LGBTQ community through a variety of sustained efforts.

The NYPD's commitment in this regard is evident at the Department's highest level. Commissioner James P. O'Neill joins the LGBTQ community each year in celebration by marching in the City's annual LGBTQ March. In addition, the Police Commissioner's Office maintains regular and ongoing engagement with the LGBTQ community through the Police Commissioner's LGBTQ Advisory Board ("the Advisory Board"). The Advisory Board is an assembly of representatives comprised of organizations, elected officials, and other individuals advocating on behalf of the LGBTQ community.[1]  It meets every month with the Police Commissioner's LGBTQ Liaison to discuss a wide range of issues of importance to the LGBTQ community. Board members meet with the Police Commissioner at least once a year or as requested, affording them the opportunity to directly voice their concerns and observations to the Department's top executive. In the past, the Board appointed a sub-committee to serve as a Working Group with several Department officials resulting in Patrol Guide revisions in 2012 that were designed to improve officers' interactions with members of the LGBTQ community who have been placed under arrest.

As indicated, the Advisory Board regularly conferences with the Police Commissioner's LGBTQ Liaison, a highly regarded member of the service who acts as the Commissioner's official connection to

---

[1] Among the organizations that comprise the Advisory Board are the NYC Anti-Violence Project, Make the Road New York, the Stonewall Democratic Club, the LGBTQ Community Center, the Brooklyn Pride Center, Heritage of Pride, ACT Up, the Hetrick Martin Institute, the Redhook Community Justice Center, Lambda Independent Democrats, the Office of the Public Advocate, the City Council Speaker's Office, the Office of the Mayor's Community Affairs Unit, several District Attorneys' Offices, and various City Council members' offices.

the LGBTQ community.[2]   The position has existed since 2002. Presently, the Police Commissioner's Liaison serves as a knowledgeable resource for the Commissioner and the Department, providing valuable information and insight about the needs of the LGBTQ community. In addition, along with the Training Bureau, the Liaison has developed LGBTQ-related training for Department personnel, ensuring that it meets appropriate standards for accuracy, sensitivity, and effectiveness.

A recent notable addition to the NYPD's efforts to foster diversity within its ranks and better reflect the communities that it serves was Police Commissioner James P. O'Neill's January 2018 creation of the NYPD's Office of Equity and Inclusion. The Office will monitor diversity within bureaus, divisions and borough commands and help develop strong women and minority candidates, including LGBTQ members of the service, to assume positions of leadership throughout the department. The newly created Office will be overseen by a Deputy Commissioner with extensive experience in training law enforcement on bias reduction and procedural fairness as well as developing strategies to enhance ties between law enforcement and communities.

In conjunction with the Police Commissioner's Office, other major commands and units play significant roles in serving the LGBTQ community.   The Office of the Deputy Commissioner for Collaborative Policing ("DCCP"), a command dedicated to improving public safety and access to police services through productive partnerships with government agencies, non-profit entities and advocates, holds regular meetings with representatives from the LGBTQ community, adhering to an "open-door" policy to foster collaboration and understanding. The DCCP, as well as the Director of the Legislative

---

[2] NYPD's present Liaison is a second-grade Detective who works full-time within the Office of the Police Commissioner and has direct access to the Commissioner. For five years prior to assuming his role as Liaison, he was President of the Gay Officer's Action League (GOAL), one of the Department's recognized fraternal organizations.   He served for thirteen years on the Executive Board of GOAL, including in the positions of Vice President and Sergeant at Arms. Included in his accomplishments are the revision of NYPD's Recruit Training on LGBTQ issues as well as having trained various law enforcement agencies on LGBTQ issues at the national and international level. He has published articles about issues relevant to the LBGTQ community. Prior to joining the NYPD, he was a Director of Client Services at the New York City Gay and Lesbian Anti-Violence Project (AVP) and served as a coordinator of the Gay Men's Health Crisis. As a result, he is well versed in issues and concerns of both the LGBTQ community at large as well as the Department's LGBTQ personnel.

Affairs Unit of the Legal Bureau, are also in contact with City Council members who are particularly interested in LGBTQ issues, providing yet more conduits for the LGBTQ community to be heard.

The Community Affairs Bureau ("CAB"), a command responsible for strengthening community relationships and trust through partnerships with leaders, organizations, associations, and citizens, includes the LGBT Outreach Unit.[3]  Formed in 2003, the Unit fosters meaningful relationships with the LGBTQ community citywide by, among other things, working diligently to provide police services and to educate the community about their rights as LGBTQ individuals under relevant provisions of law.[4]  They also conduct workshops with the LGBTQ community on personal safety, community members' rights and responsibilities when interacting with police, as well as relevant NYPD policies and procedures. In addition, the Unit provides a workshop in high schools known as "Kiki With Cops" in conjunction with the Department of Education. The workshop seeks to provide a casual setting for LGBTQ youth to pose questions to LGBTQ members of the NYPD and learn more about their experiences as law enforcement officers.

The LGBT Unit attends various events, meetings, and resource fairs,[5] regularly meets with advocacy groups, organizations and City agencies, assists victims of possible bias incidents and coordinates with organizers of rallies and demonstrations, including for example, demonstrations related to Marriage Equality, the Pulse nightclub shooting, and the Trans Day of Action Marches. As described in more detail

---

[3] The LGBT Outreach Unit is housed within CAB's Community Outreach Division. The other units within the Community Outreach Division are the Immigrant Outreach Unit, Clergy Liaison Program, and Borough Community Outreach Teams.

[4] The Unit's LGBTQ/Gender Identity presentation focuses on NYC Local Law 3 and the Mayor's Executive Order #16 of 2016.

[5] Examples include the LGBT Expo, all Borough Pride events, the Bronx Works Health Fair, the Lilac Ball, and various Senior and Health Resource Fairs.  Other initiatives that the unit has participated in are an Annual Youth and Homeless Clothing Drive to provide LGBTQ youth with clothing consistent with their gender identity and the creation of #PDPRIDE stickers including a link to the Unit's website for distribution at Pride events in the City. During the Pride month of June 2016, the Unit also created the Outsmart LGBTQ Campaign, a crime prevention effort including a website and community events to provide information about crime prevention methods.

below, they have also been instrumental in providing LGBTQ/Gender Identity Sensitivity Training to the NYPD's newly promoted sergeants, lieutenants and captains.[6]

The Department's transition to Neighborhood Policing provides the Department with additional avenues to respond to the needs and concerns of the LGBTQ community. Neighborhood Policing strengthens community relationships through its unique and innovative deployment of patrol officers,[7] known as Neighborhood Coordination Officers ("NCOs") and Sector Officers, in distinct communities and neighborhoods within precincts and PSAs. Recognizing that public safety is a shared responsibility, these officers are given the time, training, resources, and encouragement to work intensively with community members to solve problems. NCOs meet with individual members of the community at their request and attend regularly scheduled meetings with community organizations. Moreover, in each sector, the assigned NCOs organize and preside over quarterly "Build the Block" meetings,[8] also known as "Neighborhood Safety Summits," in which the NCOs and Sector Officers actively seek the input of residents, business owners, community leaders and representatives regarding issues facing that particular neighborhood. The officers also brief them on ongoing efforts by the NYPD to address their concerns. Neighborhood Policing is presently implemented in 56 of the City's 77 police precincts.[9]

---

[6] The LGBT Outreach Unit was responsible for this training from March to December 2017. As of January 2018, the Police Commissioner's Liaison will conduct the training.

[7] Under the Neighborhood Policing model, precincts and PSAs are divided into four or five fully staffed sectors that correspond as much as possible to boundaries of existing neighborhoods. Designated patrol officers, or "Sector Officers," spend their tours in their assigned sector except in cases of emergencies, thereby gaining an in depth understanding of that neighborhood, its residents and its problems. They are provided with blocks of time on each tour to engage the local community, identify issues and initiate solutions to specific problems. The Sector Officers are complemented by two Neighborhood Coordination Officers (NCOs) for each sector. The NCOs are the liaisons between the community and the police, working full-time with the Sector Officers to solve problems. NCOs attend community meetings with neighborhood leaders, visit schools, follow-up on previous incidents, and use creative techniques and skills to fight crime and develop solutions to particular problems.

[8] Members of the public can learn more about the Build the Block program and find their Build the Block meeting at https://buildtheblock.nyc/learn/

[9] It is anticipated that Neighborhood Policing will be implemented in all precincts by October 2018.

Through Neighborhood Policing, LGBTQ residents can voice their concerns and work collaboratively with the Department. For example, NCOs have visited LGBTQ individuals' residences when an individual expresses fear or embarrassment about coming to a precinct for services or to report a crime. NCOs and Sector Officers also interact with LGBTQ community organizations to foster mutual understandings. As a result, one organization recently requested an NCO's involvement in a World AIDS Day Dinner Dance with LGBTQ youth, while another advocacy group requested that their NCOs march in a community walk for World AIDS Day. The NCOs participated in both events.

The Department also places a significant emphasis on training and discipline to ensure sensitivity, professionalism, and accountability. Training focuses on treating LGBTQ individuals fairly, respectfully, and appropriately whether they are members of the public served by the NYPD or members of the service. In addition to the substantial efforts of the Training Bureau as discussed below, the Office of Equal Employment Opportunity ("OEEO"), Personnel Bureau, Detective Bureau, and Internal Affairs Bureau ("IAB") provide courses for their personnel on diversity and inclusion (including transgender diversity and inclusion), as well as the prohibition against profiling. As discussed in detail in this response, IAB thoroughly investigates allegations of profiling due to bias against sexual orientation and/or gender identity, while referring offensive language complaints based on gender and sexual orientation to the Civilian Complaint Review Board ("CCRB").

The NYPD issued guidance in the form of a Patrol Guide procedure to personnel wishing to notify the Department of their transgender or gender non-conforming transition or status. The relevant procedure recognizes the need for sensitivity and confidentiality regarding this matter and provides a framework for personnel to discuss issues with a Commanding Officer and the OEEO, such as preferred name, gender identity, if and when to inform colleagues, locker room and restroom availability, transferring to a new command if requested, and other concerns.[10] In a related development, the NYPD conducted mandatory

---

[10] Patrol Guide Section 205-68.

Department-wide training of personnel to advise them of their rights and responsibilities under the 2016 Mayor's Executive Order which addressed the use of single-sex facilities consistent with gender identity.[11]

Contrary to OIG's claim that the 2012 Patrol Guide revisions signaled a "shift" in NYPD and LGBTQ community relations, the NYPD has consistently maintained this commitment to a productive relationship with the LGBTQ community. For example, CAB's LGBT Outreach Unit has existed since 2003. As early as 1997, the Department hosted a Gay Pride celebration at Police Headquarters in conjunction with GOAL. After a hiatus, this joint celebration has returned to Headquarters in recent years. In 2009, GOAL and the NYPD co-sponsored an international conference for LGBTQ officers. Finally, as detailed in this response, the process that led to the 2012 Patrol Guide revisions started in 2009 as a dialogue between the LGBTQ community and the NYPD. These efforts are just a few examples of many other initiatives over the course of time that were aimed at fostering positive interactions, including, for example, the NYPD's recruitment at the LGBTQ Center's Job Fair, the release of the "It Gets Better" video on YouTube,[12] the creation of a PRIDE Vehicle that is driven around the City by NYPD officers during Gay Pride Month, and, after the June 2016 shooting in Orlando, the NYPD's swift response to effectively engage the community and heighten protection of vulnerable businesses and locations.

Finally, since 1982, the Department has officially recognized the Gay Officer's Action League as a fraternal organization. Included in GOAL's mission is "the promotion of a positive relationship between the law enforcement community and the LGBTQ community through a variety of community services and educational forums, with an emphasis on the principles of justice, equity, and equality within the area of

---

[11] Mayor's Executive Order No. 16 of 2016.

[12] The video included an introduction by former Police Commissioner Bill Bratton acknowledging the challenges faced by the LGBTQ community and committing the NYPD to serve as a resource for the community. In the video, LGBTQ personnel from a variety of ranks and commands share their experiences, including their respective handling of the coming out process, how they sought and received support, and how the NYPD empowered them to serve the LGBTQ community more effectively. They also address the importance of reporting bullying and offer encouragement, friendship, or support to LGBTQ youth. The video closes with contact information for the Trevor Project Helpline, an organization dedicated to provide crisis intervention and suicide prevention for LGBTQ youth.

law enforcement."[13] GOAL has been involved in designing and implementing Department training since 1997 and actively educates personnel on LGBTQ related matters.

## II.   THE NYPD'S 2012 PATROL GUIDE REVISIONS – EVOLUTION AND SUBSTANCE

The genesis of one of the significant results of the NYPD's varied outreach efforts to the LGBTQ community occurred in the spring of 2009 when representatives from several advocacy groups suggested changes to the NYPD's Patrol Guide.[14] The representatives brought their suggestions directly to a member of the Community Affairs Bureau's LGBT Outreach Unit. In response, during 2009 and 2010, the NYPD had extensive internal discussions and determined that several changes to its procedures were warranted. Department representatives, including the Counsel to the Police Commissioner and an executive agency attorney assigned to the Legal Bureau, formed a Working Group consisting of members of the Police Commissioner's Advisory Board. The Working Group discussions focused on a number of issues that were important to the LGBTQ community regarding the treatment of transgender and gender non-conforming members of the community who were taken into custody. These issues included recording gender identity as opposed to legal identity on Department forms, the use of preferred names, pronouns and titles of respect, and certain procedures pertaining to interactions with LGBTQ persons who are taken into custody by officers.

The discussions, which continued throughout 2011 and into early 2012, were productive and resulted in a consensus about specific revisions to the Patrol Guide.  The results of these efforts were presented to the full Advisory Board in a meeting in April 2012 with the Police Commissioner. In June 2012, the revisions were announced at the New York City Council's Celebration of LGBTQ Pride, during which the Police Commissioner's Advisory Board received an award for its role in the process.  As described in further detail below, the NYPD followed with extensive in-service training, including Training

---

[13] See GOAL Mission Statement at www.goalny.org/mission-statement.

[14] The Patrol Guide is available at https://www1.nyc.gov/site/nypd/about/about-nypd/patrol-guide.page

Memoranda and Interim Orders in July and October of 2012. In addition, adjustments were made in the fall of 2012 to recruitment and promotional training to reflect the revisions.

The substance of the revisions, as well as the Department's commitment to the LGBTQ community and the safety of transgender individuals, were also praised by the City Council Speaker and a wide range of organizations, including the NYCLU, the New York City Anti-Violence Project, the LGBT Community Center, the Stonewall Democrats, and the Transgender Legal Defense and Education Fund.[15] The substance of the relevant 2012 Patrol Guide revisions[16] are as follows:

**Use of Preferred Names and Prohibited Remarks**

Police officers are required to address others using pronouns, titles of respect, and preferred names appropriate to the individual's gender[17] identity or expression as indicated by an individual. Conversely, police officers are prohibited from using discourteous or disrespectful remarks regarding another person's ethnicity, race, religion, gender, gender identity or expression, sexual orientation, or disability.[18]

During arrest processing, preferred names are to be used when officers complete three important forms: the Online-Booking System Arrest Worksheet, the Prisoner Pedigree Card, and the Prisoner Movement Slip.[19] These forms were specifically chosen by the Working Group because they pertained to individuals in custody, the focus of the discussions. Arresting officers must also indicate preferred name in

---

[15] "NYPD Patrol Guide Changes Respect Rights of Transgender New Yorkers." (June 12, 2012) at https://www.nyclu.org/en/press-releases/nypd-patrol-guide-changes-respect-rights-transgender-new-yorkers and "NYPD Announces New Policies on Interactions with Trans New Yorkers." (June 12, 2012) at http://gaycitynews.nyc/nypd-announces-new-policies-on-interactions-with-trans-new-yorkers.

[16] It should be noted that although OIG includes Patrol Guide Section 203-25 prohibiting profiling by officers based on, among other things, sexual orientation, this section was not part of the 2012 revisions. Patrol Guide Section 203-25 was revised in 2016 although its content reflects a long-standing prohibition. In 2012, an Operations Order prohibiting profiling was issued followed by an Interim Order in 2012 and finally Section 203-15 in 2013.

[17] "Gender" includes actual or perceived sex as well as gender identity, self-image, appearance, behavior, or expression regardless of whether those qualities are different from those traditionally associated with the legal sex assigned to that person at birth. See Patrol Guide Section 203-10.

[18] Patrol Guide Section 203-10.

[19] *See* Patrol Guide Sections 208-02 and 208-03.

their Activity Log, more commonly referred to as their "memo book."[20] By directing that an individual's preferred name be used on these documents, the NYPD ensures that while an arrested individual is in the custody of the police prior to appearing in court for arraignment, that individual will be addressed appropriately and with professionalism and respect.

The 2012 revisions also include specific guidance with respect to the criminal charge of False Personation. According to the Penal Law, a person is guilty of false personation when, after being informed of the consequences of such act, he or she knowingly misrepresents his or her actual name, date of birth or address to a police officer or peace officer with intent to prevent such police officer or peace officer from ascertaining such information.[21] Such a charge requires a knowing misrepresentation of a person's pedigree information and the intent to prevent an officer from ascertaining the accurate information. The 2012 revisions clarified for officers that an individual who simply provides a preferred name to a police officer during a variety of encounters, including driver license checks and arrest processing, cannot be charged with false personation because they lack the requisite criminal intent.[22]

**Search Protocols and Treatment of Prisoners**

In general, under NYPD procedures, prisoners are searched by a police officer of the same gender. Pursuant to the 2012 revisions, when an arrestee's gender is not immediately apparent or if there is an objection to the assigned officer's gender by the arrestee, a supervisor shall assign an officer of the gender requested by the arrestee to conduct the search so long as such an assignment is consistent with officer safety and available resources. If the gender of the assigned officer differs from the gender requested by the arrestee, the factors behind this decision are recorded in the Command Log.[23] Officers are prohibited from

---

[20] *Id.*

[21] *See* New York Penal Law Section 190.23.

[22] *See* Patrol Guide Sections 208-28; 208-54; 209-24; 209-26.

[23] The Command Log is a chronological record of certain activities in a command, including roll call, property received, issuance of equipment, and prisoner delivery.

conducting searches for the purpose of determining gender and cannot inquire about an arrestee's anatomy absent a reasonable basis for such inquiry.  Strip searches are permitted only when applicable legal standards are met, are subject to the provisions detailed above, and also require a secure area, utmost privacy, and the presence of only those officers reasonably necessary to conduct the search while ensuring the safety of all involved.[24]

Under the 2012 revisions, prisoners are to be lodged in holding cells according to their gender identity.[25]  The Patrol Guide revisions also provide protocols regarding Special Category Prisoners -- individuals who are separated from other detainees due to a medical concern, safety risk, or health risk.  To be clear, under NYPD procedures, transgender persons in custody do not automatically fall within the definition of a Special Category Prisoner. If, however, a transgender prisoner meets the criteria for this designation, the revisions to the Patrol Guide require the notification by the precinct to the relevant borough court section that a Special Category Prisoner is housed within the precinct or in another facility.  A notation on the Prisoner Movement Slip describing the reason for the designation of a Special Category Prisoner is also required. Finally, the revisions prohibit designating an individual eligible for a Desk Appearance Ticket[26] as a Special Category Prisoner.[27]

**Search Protocols for Students**

Generally, the 2012 revisions require that, when legally permissible, students are to be searched by a school safety agent of the same gender. The revisions for students mirror most of the search protocols for adults. When a student's gender is not immediately apparent or if there is an objection to the assigned

---

[24] *See* Patrol Guide Sections 208-05, 210-08.

[25] *See* Patrol Guide Section 210-08.

[26] A Desk Appearance Ticket is issued in lieu of detention for certain misdemeanors, violations and for hospitalized prisoners charged with certain Class "E" felonies (the lowest level felony).

[27] *See* Patrol Guide Sections 208-27, 210-01, 210-04, 210-17.

agent's gender by the student, a supervisor shall assign an agent of the gender requested by the student, consistent with agent safety and available resources. Agents are prohibited from conducting searches for the purpose of determining gender and cannot inquire about an arrestee's anatomy absent a reasonable basis for such inquiry. Strip searches of students by school safety agents, however, are explicitly prohibited.[28]

### III.   NYPD's Compliance with the Patrol Guide Revisions

#### A.   NYPD's Compliance with the 2012 Patrol Guide Revisions is Anchored in Comprehensive Training for All Personnel.

Following the adoption of the 2012 Patrol Guide revisions, and contrary to OIG's repeated assertions in its report,[29] the NYPD took immediate steps to educate its personnel about the revisions as well as the underlying rationale for these changes. Education began with the release of Interim Orders in June and September 2012 which notified officers of the substantive changes to the pertinent Patrol Guide procedures regarding transgender individuals. Building on the Interim Orders, the NYPD issued a Training Memorandum ("Training Memo") in July and October 2012.[30]

---

[28] *See* Patrol Guide Section 215-18.

[29] OIG recounts "general and anonymous" reports from the LGBTQ community that NYPD officers are not following the 2012 Patrol Guide revisions and that some of these anonymous sources feel uncomfortable reporting crimes to the NYPD. *See* OIG Report, P. 4. In addition, OIG reports that due to generalized community perception, there is a sense in the community that police unfairly target transgender non-conforming people of color. While reports from unnamed sources who are unwilling to provide specific instances of officer misconduct to support their feelings or perceptions may be sufficient to initiate an investigation, such information is simply not reliable enough to support valid empirical conclusions. Indeed, that is why police officers may not search or arrest a citizen based on purely anonymous information, unless it can be demonstrated that the source of the information is reliable and has a sufficient basis of knowledge as opposed to simply passing along rumors. *See* Spinelli v. United States, 393 U.S. 410 (1969); *See also* Aguilar v. Texas, 378 U.S. 108 (1964).

It should be noted that the NYPD urged OIG to provide the Department with the names and identity of any and all individuals who claimed to be a crime victim or who had witnessed officer misconduct, so that the NYPD could fully investigate any such claim and take appropriate action. OIG failed to provide any such information, suggesting that they are unaware of any specific claims.

[30] The July 2012 Training Memorandum disseminated preliminary information about thirteen of the fifteen Patrol Guide revisions. Two others that were not included were awaiting final approval. The October 2012 Memorandum was more comprehensive and included a discussion of all of the revisions.

A Department Training Memo is a vehicle by which important information, including changes and updates in procedures, is disseminated and emphasized to personnel through in-service training. Training Memos are commonly issued and are created by the Training Bureau after consultation with the Bureau requesting its issuance. The NYPD holds a monthly Command Level Training Conference whereby training sergeants or representatives from each command receive these memos. Training Sergeants or representatives are then responsible for educating their commands about the content. This instruction is repeated several times within commands to guarantee that officers on all tours are educated. Personnel trained through this method are also mandated to familiarize themselves with pertinent Patrol Guide revisions and procedures. The NYPD has been utilizing this method of education for its personnel since 1993. It has frequently been employed to emphasize important Patrol Guide revisions including those made pursuant to the Department's new use of force policy, its emphasis on de-escalation, and other tactics.

The October 2012 Training Memo consolidated and summarized the various revisions in a single easy reference document, enhancing the officers' appreciation of the comprehensive nature and purpose of the changes. Moreover, a plain reading of the document refutes OIG's claim that "the Department has not explained to all officers why the changes were necessary or that they specifically apply to [gender non-conforming people.]"[31] The Training Memo's first lines directly address these issues:

> "In recent months, the NYPD has made changes to several Patrol Guide procedures which directly affects members of the lesbian, gay, bisexual, and transgender ("LGBT") community. To ensure the fair and equitable treatment of all persons, members of the service are reminded that they must treat all individuals in accordance with their preferred gender identity...."

Thus, the Training Memo made abundantly clear that the changes were prompted by the need to ensure that various Patrol Guide provisions were more responsive to the needs of the LGBTQ community and that members of this community were entitled to respectful, fair, and equitable treatment. The repeated references to "all persons" and "all individuals" leave no doubt that the policies apply to gender non-conforming people.

---

[31] OIG Report, P. 5.

To guarantee that the substance of the 2012 revisions were clearly and effectively disseminated to all personnel, NYPD's Training Bureau disseminated the Training Memo at the October 2012 Command Level Training Conference.  The October 2012 Command Level Training Conference was attended by Training Sergeants from 81 of the 97 patrol commands.  Training Sergeants who could not be present at the Conference were required, within one week, to appear in the office of the Commanding Officer of the Specialized Training Unit who oversees all in-service training in the Department. At this meeting, the absent Training Sergeants received personal briefings and the relevant materials. Through this process, all commands received training on the 2012 revisions shortly after they were adopted.

Moreover, at the October 2012 Command Level Training Conference, the distribution of the Training Memo was accompanied by a detailed lecture by the NYPD Legal Bureau attorney who had worked extensively with the Working Group to develop and finalize the revisions. In her lecture, the Legal Bureau attorney provided the historical background leading to the changes and clearly conveyed why the changes were necessary. In addition, she explained in detail each of the revisions and responded to questions. Her lecture included specific examples of the appropriate treatment of gender non-conforming individuals. The attorney recalls the Conference as well-attended with an engaged audience.

In October 2016, the Department held a second Command Level Training Conference, attended by all but one of the 98 patrol commands.[32] Again, the missing Training Sergeant was required to obtain a separate briefing and materials from the Specialized Training Unit.  At this Conference, the lecture was provided by the Police Commissioner's LGBTQ Liaison and again covered the revisions in detail. The Training Sergeants were then dispatched to provide a second round of training to all of their respective commands.

Despite being fully advised of the extent and scope of the efforts that NYPD took to ensure that members of the service were fully advised of the 2012 revisions, OIG omitted much of this information from their report and thus failed to accurately and fully describe NYPD's in-service training.  OIG's report

---

[32] The 121st Precinct was added on July 1, 2013 as the 98th patrol command.

suggests that in-service training primarily consisted only of precinct level training on an "as-needed basis."[33] To be sure, the NYPD has added yet another layer of in-service training on the 2012 revisions in the form of roll call training whenever a commanding officer from a precinct or police service area requests it. This additional training is provided by the LGBTQ Liaison and/or a representative from the LGBT Outreach Unit of the Community Affairs Bureau. But it hardly represents the entirety of in-service training on the 2012 revisions as OIG alleges.

An accurate assessment of the entirety of NYPD's in-service training, including the Command Level training initiatives in 2012 and 2016, along with the additional refresher roll call courses available upon request, leads to the inescapable conclusion that NYPD's in-service training has been significantly more thorough and complete than OIG portrays in its report, and was certainly as comprehensive as the recruit and promotional training of which OIG approved.[34] Moreover, when evaluating how many officers who are presently on patrol have been trained on the revisions, OIG fails to take into account that since mid-2012, approximately 10,500 officers have graduated from the Police Academy where they received the training. They represent a significant percentage of the approximately 22,000 officers currently on patrol. This reality, along with extensive in-service training, as well as the distribution of a May 2017 Administrative Bulletin,[35] conclusively demonstrates that OIG's claim that "a significant contingent of officers have not been trained on the Patrol Guide provisions and corresponding LGBTQ and TGNC issues"[36] is plainly false.

OIG reaches another flawed conclusion due to their failure to acknowledge the existence and extent of NYPD's command level training on the 2012 revisions. OIG asserts that the units responsible for in-

---

[33] *See* OIG Report, P. 11.

[34] *See* OIG Report, P. 13.

[35] In May 2017, NYPD distributed an Administrative Bulletin to all personnel to remind them that searches for the sole purpose of determining gender identity were prohibited. OIG implies that their investigation was the impetus for the Administrative Bulletin. The Administrative Bulletin was generated after the Police Commissioner met with representatives from a community group and directed that the issue be addressed with all personnel.

[36] *See* OIG Report, P. 14.

service training are understaffed, referring only to the Community Affairs Bureau's LGBT Outreach Unit and the Police Commissioner's Liaison, while ignoring the Training Bureau's Specialized Training Unit and the 97 Training Sergeants who were tasked with educating officers about the 2012 revisions. When examined in its totality, the NYPD has clearly devoted considerable resources to ensuring that its personnel have been trained in this area and has devoted almost twice as many resources to the training as Washington, D.C.'s Metropolitan Police Department, to which OIG compares the NYPD in this regard.

OIG acknowledges that the NYPD provided comprehensive training regarding the 2012 revisions to recruits and newly promoted sergeants, lieutenants, and captains,[37] characterizing this training as "covering LGBTQ and TGNC issues and corresponding Patrol Guide provisions."[38] Recruits have been trained on relevant issues arising from police interactions with the LGBTQ community since 1997, when the Department partnered with GOAL to improve and update its training in this area. Through this module, recruits learn about the issues and concerns of the LGBTQ community, the distinctions between gender identity and gender expression as well as other terms and definitions, the application of the 2012 Patrol Guide revisions, relevant statutes, and other issues that may arise in professionally serving the LGBTQ community and impartially enforcing the law. Since 2013, the class has been co-taught by a transgender member of the service.

At the supervisory level, promotional training is required for new sergeants, lieutenants, and captains. This training includes an explanation of NYC Human Rights Commission Local Law 3 of 2002 which prohibits unlawful discrimination in public accommodations, housing and employment on the basis of gender, gender identity and gender expression, a review of the 2012 revisions to the Patrol Guide. Training also covers key terms frequently used by LGBTQ communities and corresponding definitions, appropriate interaction with LGBTQ co-workers and community members, the proper completion of

---

[37] OIG incorrectly labels the promotional training courses as the Basic Management Operations Course (BMOC-1) and the Advanced Leadership Training Course (BMOC-2). The correct names for these courses are the Sergeants Development Course, Lieutenants Development Course, and Captains Development Course.

[38] *See* OIG Report, P. 13.

Department forms when an LGBTQ person is arrested, and the importance of recognizing and conducting proper investigations when members of the LGBTQ are victims of bias crimes, among other relevant topics.

OIG's other claims and suggestions regarding the Department's training are similarly misplaced. First, the suggestion that NYPD's failure to issue a memo book insert on protocols for engaging with transgender individuals somehow signals a lack of commitment to the LGBTQ community is meritless. NYPD personnel are required to review all Patrol Guide revisions, a responsibility that is easily accomplished through ready access to the Patrol Guide on Department-issued smartphones and tablets. These immediately accessible resources are available in the field should an officer need to refresh his or her knowledge about the provisions. Moreover, as a matter of routine, the Department does not create a memo book insert for every Patrol Guide revision for obvious reasons – officers' memo books would quickly become unwieldy and overloaded with such addendums, eclipsing the book's primary purpose of serving as a daily activity log. Finally, in the future, the Department is planning to transition to electronic memo books through a smartphone application, thus rendering OIG's recommendation obsolete.

OIG takes issue with what they perceive to be a disparity between the content of the handout that is distributed in recruit training and the one that is distributed during promotional training.[39] As a practical matter, however, the provision of different materials is appropriate and logical given the different audiences and goals of each of these training programs. The goal of promotional training is to teach new supervisors how to manage and oversee officers in their commands. Recruit training is aimed at providing individuals with basic policing skills and tactics. In this sense, providing identical materials to each group of trainees makes little sense. In addition, all newly minted supervisors have received recruit training earlier in their careers as well as the 2012 and 2016 in-service training described above.  To be clear, the materials for each training program overlap in some respects but some disparity is appropriate given the divergent purposes of each program.

---

[39] OIG also contends that the materials provided to recruits include outdated reports or statistics but fails to specify which information is presently incorrect or inaccurate. OIG's additional claim that the recruit handout is somehow flawed because it doesn't include the 2012 Training Memorandum or information on recording preferred names is without merit. These matters are thoroughly covered in recruit training which OIG concedes is "comprehensive."

**B. NYPD'S Forms Are Consistent with the 2012 Patrol Guide Revisions and Reflect the Extended Discussions with Advocates and Representatives from the LGBTQ Community.**

In order to effectively implement the 2012 Patrol Guide revisions, the NYPD amended several forms to reflect the preferred names of individuals. The amended forms include those that officers are required to fill out in connection with an arrest -- the Prisoner Pedigree Card, Prisoner Movement Slip, and the Online Booking System Arrest Worksheet. Once the Online Booking System Arrest Worksheet is completed, any preferred name that is entered on that form is automatically recorded in OmniForm, the Department's arrest and crime complaint database. In the years leading up to the revisions, the NYPD and the Working Group from the LGBTQ Advisory Board chose to amend these particular forms because the focus of the revisions was on NYPD's interactions with transgender and gender non-conforming individuals who were taken into custody. Thus, OIG's criticism of the NYPD for not implementing a wholesale amendment of 28 additional forms is illogical and its observation that "the policies and instructions on recording preferred names do not conform to the spirit of the 2012 Patrol Guide provisions"[40] is plainly incorrect.

With respect to the additional 28 forms that it identifies as requiring revision, OIG failed to take into account that, in the past, during the NYPD's promotional training, newly appointed sergeants, lieutenants and captains have received specific instruction from the Community Affairs Bureau's LGBT Outreach Unit that addressed including preferred names on forms. This training emphasized that when no preferred name field appears on a form, the supervisors, when reviewing paperwork of officers under their supervision, should ensure that an individual's preferred name is included, assuming that the individual volunteered this information and inclusion on the particular form is appropriate.

OIG notes two other minor issues. First, OIG asserts that one of the fourteen precincts that OIG visited used an old version of a Prisoner Pedigree Card. The NYPD acknowledges that current and accurate versions of forms should be used and has remedied this particular issue within that precinct. OIG also

---

[40] *See* OIG Report, P. 19.

mentions that in early 2017, software pertaining to the Prisoner Movement Slip had not been updated to reflect the preferred name field when the form was completed at the precinct level, although the NYPD was recording preferred names on a second, superseding Movement Slip at Central Booking. As OIG concedes, NYPD remedied this issue in October 2017 prior to the issuance of its report.

OIG also suggests that the NYPD reconsider the entry of gender identity on forms. While recognizing that it is "essential" for the NYPD to document the legal gender on its forms, OIG nevertheless suggests that the NYPD revisit this issue with community representatives and reconsider whether to add additional options for recording purposes. OIG suggests that this is necessary "to ensure that the Department is addressing the individual's current gender and avoid violating Patrol Guide Section 203-10."[41] OIG claims that two factors warrant this reassessment: (1) the passage of time since 2012 and (2) "the differing viewpoints of some community organizations."[42]

In reality, as OIG is aware, the NYPD discussed this issue at length with community representatives as recently as 2011 and 2012, and since then has remained engaged with representatives through the variety of avenues described above, including the Advisory Board. The passage of five years has not changed what was evident at the time and what OIG acknowledges – that there is no consensus among community representatives and advocates regarding OIG's proposal to record current gender on department forms. Indeed, it is the NYPD's experience, based on both the earlier as well as ongoing discussions, that many members of the LGBTQ community do not want the police to question them about their gender identity, believing such inquiries to be an invasion of privacy and balk at the notion of law enforcement collecting such information for storage in databases.[43] At the conclusion of the 2011 and 2012 discussions, the LGBTQ

---

[41] *See* OIG Report, P. 19.

[42] *See* OIG Report, P. 20.

[43] OIG cites the US Department of Justice's research findings that advocacy groups strongly emphasize that law enforcement should not collect data regarding sexual orientation or gender identity. *See* OIG Report, P. 20.

representatives agreed with the NYPD that such a proposal was unworkable both from the NYPD's operational perspective as well as the community's civil rights and privacy perspectives.[44]

Nor does the failure to record a person's gender identity on a department form violate Patrol Guide 203-10. That provision of the Patrol Guide requires officers, while interacting with the public, to address individuals using pronouns, titles of respect and preferred names appropriate to an individual's gender identity as expressed by the individual. The provision does not refer or apply to the completion of forms.

To be clear, the NYPD is presently engaging with representatives of the LGBTQ community on any issues that they bring to the Department's attention. Thus, OIG's recommendation that the NYPD re-engage with representatives is unnecessary and entirely satisfied. The NYPD will continue to engage with the LGBTQ community and will consider any input that results from further discussions.

### C. IAB Tracks and Evaluates Profiling Complaints by Members of the LGBTQ Community as well as Complaints Involving Offensive Language.

The NYPD takes seriously any allegation of misconduct by a member of the service, including allegations made by members of the LGBTQ community. In general, these allegations fall into two categories. If a member of the LGBTQ community complains that an officer acted or failed to act because the officer is perceived to be biased against that individual due to that individual's gender, sexual orientation or gender identity, the Department classifies such an allegation as profiling.[45] In order to substantiate such an allegation, IAB investigators must develop credible and reliable evidence that an officer acted or failed to act because of the officer's specific bias. A perception by a complainant that an officer is biased (as opposed to the existence of objective evidence firmly establishing bias) is not sufficient to substantiate such

---

[44] In addition, both the NYPD and the community representatives agreed that it would be difficult for the NYPD to include on its forms all of the possible options that would arise in recording an individual's current identity and that, for law enforcement purposes, such information was not necessary.

[45] Profiling cases are classified as Misconduct or "M" cases, the second most serious IAB category.

an allegation, although such a perception is certainly sufficient for IAB to thoroughly investigate the claim. This is both reasonable and consistent with basic principles of fairness.[46]

On the other hand, a complaint that an officer used offensive language in interacting with a member of the public does not meet the clear definition of profiling because the use of language, standing alone, does not amount to action or inaction by the officer. Instead, such a complaint, including the use of a slur related to a complainant's actual or perceived gender identity or sexual orientation, is categorized as an Offensive Language allegation. Such allegations are further classified as either "Offensive Language – Gender" or "Offensive Language – Sexual Orientation."[47] IAB uses these sub-categories because they correspond to the manner in which CCRB categorizes allegations and IAB refers all Offensive Language allegations to the CCRB for investigation and disposition. IAB makes these referrals because such allegations fall squarely within the jurisdiction of CCRB. Under the City Charter, CCRB is granted the authority to investigate allegations of offensive language by an officer as well as excessive force, abuse of authority and discourtesy.[48]

In its report, OIG devotes considerable effort to attempting to establish that IAB's categorizations of allegations does not "fully capture potentially biased conduct," that IAB is not capable of tracking what OIG terms "LGBTQ-related" complaints and that, as a result, NYPD cannot presently discern patterns of misconduct by a particular officer or in certain commands and precincts. A careful examination of IAB's practices, however, proves these statements to be inaccurate.

---

[46] For example, in the Department's disciplinary process, the trial judge does not find an officer in violation of a provisions of the Patrol Guide based upon that judge's perception of guilt. Rather, the judge bases such a finding on credible and reliable evidence that meets the burden of proof of a preponderance of the evidence. Nor in our criminal justice system is a jury permitted to render a verdict of guilty based on their perception of a defendant's guilt, but only when credible and reliable evidence has established guilt beyond a reasonable doubt.

[47] Offensive Language allegations are also further classified by race, ethnicity, religion, or physical disability.

[48] *See* NYC Charter, Chapter 18A. The Civilian Complaint Review Board is an independent New York City agency responsible for investigating allegations of excessive force, abuse of authority, discourtesy, or offensive language (FADO) against NYPD officers, making findings, and recommending specific disciplinary action to the Police Commissioner.

To begin, IAB broadly defines profiling as *any* action or inaction based on bias. Given this all-encompassing definition, it is hard to imagine what conduct IAB is failing to capture. If an officer takes official police action because he or she is biased – for example, writes a ticket, stops a motorist, or makes an arrest – IAB's profiling definition will capture that conduct. Conversely, if the officer fails to act in these and other instances where official police action should be undertaken, his or her omission to act is captured when the inaction is alleged to have been due to bias. In sum, once a complainant points to an officer's conduct or lack thereof, and couples it with a claim that the complainant believes the officer was biased because of the complainant's gender, sexual orientation or gender identity, IAB captures and categorizes that conduct as profiling. Moreover, it is hard to envision a situation where a member of a particular gender, race, religion, sexual orientation or sexual identity goes so far as to lodge an official complaint against an officer with IAB because the complainant feels that the officer acted or failed to act due to bias, but fails to mention that perception of bias to IAB during the initial report.

With respect to profiling cases, the NYPD is not hindered in its ability to discern patterns of misconduct and take remedial action. As OIG concedes,[49] all profiling complaints are entered into IAB's computerized case tracking system, known as the Internal Case Information System ("ICIS") and are reviewed by experienced IAB executives at the command's highest level. These reviews are conducted twice each year. One of the significant duties and responsibilities of these executives is to recognize patterns and trends of misconduct and to take appropriate action. With respect to Offensive Language complaints, such allegations are also entered into ICIS by the sub-categories "Offensive Language – Gender Identity" and "Offensive Language – Sexual Orientation" which are easily tracked and analyzed. Thus, OIG's concern is unfounded.

In its report, OIG refers to thirty-seven complaints to IAB from 2015 and claims that they illustrate that NYPD is not capable of accurately tracking and analyzing complaints related to the Patrol Guide revisions. NYPD's examination of these thirty-seven complaints revealed that OIG's methodology and

---

[49] *See* OIG Report, P. 22, Fn. 36.

analysis on this point are highly questionable. First, OIG labeled these thirty-seven complaints as "LGBTQ related," a vague term of OIG's creation for which they offer no further definition or criteria. Apparently, however, such a term includes a complaint about the 2015 conduct of an on-duty police officer at the City's annual LGBTQ March. OIG included this among the thirty-seven. Yet, this complaint has nothing to do with the Department's ability to track allegations related to the 2012 revisions. The officer's conduct consisted of spontaneously dancing while in uniform at the parade with an individual who was marching in the parade with an LGBTQ sports group. The officer's gesture was applauded by the LGBTQ community, City residents, the news media and the NYPD as a positive interaction by a member of the service with the community he served. As Police Commissioner James P. O'Neill stated at the NYPD's Pride Celebration at police headquarters in 2017, "[t]hat simple act uplifted the City's spirits and delivered a message of inclusion and compassion."[50] GOAL's President at the time described the conduct as having "represented the true spirit of the police family."[51] The person who lodged the complaint felt that the officer acted in an unprofessional manner, an allegation that had nothing to do with profiling. In this particular case, the NYPD investigation determined that there was no misconduct on the part of the officer. In its report, OIG nevertheless faults the NYPD for not being able to readily identify and track this allegation.

Other complaints included by OIG in the thirty-seven cases termed "LGBTQ-related" are equally puzzling. Several involved the arguably biased conduct by a member of the public and not an officer. Another involved arguably biased statements by the complainant *against* an officer, claiming that the officer had "gay tendencies." In one case, the complainant, a member of the LGBTQ community, specifically told IAB that the complainant had no problem with the police, but took issue with a neighbor who was repeatedly

---

[50] http://www.nydailynews.com/new-york/nypd-twerk-michael-hance-honored-gay-officers-event-article-1.3267856

[51] See http://www.nydailynews.com/new-york/nypd-officer-twerked-parade-dies-9-11-related-cancer-article-1.2997829. The gesture was also described as "a powerful message that we are all brothers and sisters to one another, no matter our sexual preference, nationality, our color or creed." http://www.nydailynews.com/new-york/nypd-michael-hance-twerk-video-remembered-funeral-article-1.3002167

making unreasonable noise for several years despite the continual response and action by NYPD officers to ameliorate the situation. Several others involved complainants who did not identify themselves as LBGTQ but who were simply present at the LGBTQ March. These individuals complained about a particular officer's enforcement activity, but never mentioned any offensive language, slurs or bias on the part of the officer. OIG appears to have labeled these as "LGBTQ related" simply because the place of occurrence was the LGBTQ March.

In sum, the NYPD did not fail to identify or track thirty-seven complaints that could shed light on patterns or trends related to violations of the 2012 revisions to the Patrol Guide. Of the thirty-seven complaints highlighted by OIG, a number of them, as described above, had nothing to do with any such violations. Moreover, four of the thirty-seven involved an allegation of Offensive Language, which IAB tracks through its computerized case tracking system. Nine others were designated as profiling, each of which is similarly tracked and subjected to executive review by IAB. Finally, even if all thirty-seven cases involved violations of the 2012 revisions to the Patrol Guide, drawing reliable inferences about patterns and trends from such a small sample is questionable. Indeed, in its report, OIG did not draw any such inferences.

## IV.    NYPD's Responses To OIG-NYPD's Recommendations

**Recommendation #1: NYPD should provide mandatory in-service training and accompanying resource materials on the 2012 Patrol Guide revisions to all uniformed members through the NYPD-U webinar platform.  Training attendance and completion should be tracked to ensure that all member of the police force have received this training.  NYPD should conduct this training within the next six months.**

*Accepted in Principle.* As described above, the NYPD conducted extensive in-service training in 2012 and again in 2016. In addition, since 2012, approximately 10,500 recruits have graduated from the Police Academy where they received recruit training on this topic. The NYPD accepts this recommendation in that it will conduct a refresher course for members of the service via its on-line platform, NYPD-U, and will do so by the end of 2018.

**Recommendation #2: NYPD should create a memo book insert for officers with a summary of the revised LGBTQ protocols.  Officers can use this for reference as needed.**

*Rejected.*  For the reasons noted above at page 17, NYPD rejects this recommendation.

**Recommendation #3: Community input should be carefully considered and incorporated as appropriate into the curriculum of officer training on LGBTQ issues.**

*Implemented by the NYPD prior to OIG's Report and Recommendation.*   Historically, the Department's LGBTQ-related training has been developed with input from a variety of sources, including representatives of various organizations from the LGBTQ community. These discussions are ongoing.

**Recommendation #4: All handouts and additional resource materials provided during LGBTQ trainings should be consistent, as appropriate, ensuring that officers receive the same information.**

25

*Implemented by the NYPD prior to OIG's Report and Recommendation.* The NYPD presently distributes training materials that are consistent, as appropriate, given the different goals of the different training programs and the needs of those being trained.

**Recommendation #5: Within six months, NYPD should report to OIG-NYPD whether and how the Department will change remaining forms and databases to record an individual's preferred name in a separate field.**

*Accepted.* NYPD agrees to review the 28 Department forms that OIG has listed in Appendix C of OIG's report in order to determine whether changes to those forms are appropriate. NYPD will provide OIG with the requested information within six months.

**Recommendation #6: On a periodic basis, NYPD should make sure that police stations are using updated forms, particularly those documents that are intended to comply with the 2012 revisions.**

*Implemented by the NYPD prior to OIG's Report and Recommendation.* The NYPD has corrected the oversight at the one precinct regarding the utilization of an outdated Prisoner Pedigree Card. No further remediation is necessary. In the other thirteen precincts visited by OIG, the revised forms were being utilized. NYPD procedures currently require commands to utilize newly adopted forms and destroy older versions. Commands are notified of such changes by means of a FINEST message. As the Department moves toward its goal of creating electronic versions of all forms, the above procedures will become unnecessary.

**Recommendation #7: NYPD should consult with its LGBT Advisory Board and re-examine whether and how to record gender identity information of TGNC people on NYPD forms and databases. The collection of this information is a sensitive matter for some members of the LGBTQ community. Any**

changes in how such information is recorded must not interfere with NYPD's ability to describe and circulate descriptions of suspects and persons of interest for purposes of apprehension.

*Implemented by the NYPD prior to OIG's Report and Recommendation.* The NYPD regularly consults with the Advisory Board regarding any issues that the Board wishes to discuss. See pages 2-3 above.

**Recommendation #8: NYPD Internal Affairs Bureau's complaint system should be configured to categorize and track all LGBTQ-related allegations that implicate biased conduct, and not just "profiling." LGBTQ-related allegations involving bias would include violations of the 2012 Patrol Guide revisions and "offensive language."**

*Implemented by the NYPD prior to OIG's Report and Recommendation.* As noted above, IAB is presently capable of tracking Profiling complaints, including allegations based on sexual orientation, gender, and gender identity, and "Offensive Language," complaints including the sub-categories of "Offensive Language -- Gender" and "Offensive Language – Sexual Orientation." This is done through its computerized case tracking system. At an executive level, IAB reviews all profiling cases involving allegations by members of the LGBTQ community. For the reasons noted above at pages 22-24, NYPD considers this recommendation to have been implemented by the NYPD prior to OIG's Report and Recommendation and has demonstrated that OIG's term "LGBTQ-related" allegations to be poorly defined and incapable of effective implementation.

**Recommendation #9: IAB should report patterns and trends associated with LGBTQ-related complaints to NYPD's LGBT Liaison to the Police Commissioner as well as to DOI pursuant to NYPD's reporting obligations under Local Law 70.**

*Implemented by the NYPD prior to OIG's Report and Recommendation.* As OIG is aware, the Deputy Commissioner of IAB reports directly to the Police Commissioner on all matters of import to the

Department, including patterns or trends of misconduct by members of the service. Patterns or trends of profiling would fall within the scope of this reporting. The Deputy Commissioner of IAB presently complies with all legal obligations pursuant to Local Law 70 as defined by Section 803 (c) of Chapter 34 of the New York City Charter.

**V.**     <u>CONCLUSION</u>

The NYPD is committed to serving and meeting the needs of the LGBTQ community with sensitivity, equity, and effectiveness. To that end, the NYPD has carefully and thoughtfully designed and implemented effective policies, training protocols, outreach initiatives, and disciplinary processes. The NYPD will continue to communicate and collaborate with the LGBTQ community as we seek to further strengthen our relationship with all of the communities throughout the City that we protect and serve.

Very truly yours,

Lawrence Byrne
Deputy Commissioner Legal Matters

28